HERMANN J. MEYER *vs.* DANA ESTES & others.

Suffolk.    December 11, 12, 1894. — October 19, 1895.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & BARKER, JJ.

*Contract — Construction — Breach — Parties — " Successor " — Validity —
Restraint of Trade — Lex Loci Contractus — Damages — Penalty.*

If a contract provides for the use by A. of certain articles to be ordered of B., and, while the contract is in force, B. forms a partnership with C. without A.'s knowledge, articles subsequently ordered by A. and furnished by the partnership must, as between the parties be regarded as furnished by B., acting through the partnership, to A. in pursuance of the contract.

A contract recited that "the undersigned, Messrs. A. & B. and Messrs. C. & D., . . . hereby agree to use all electrotypes ordered from E. . . . only for the purpose of illustrating works to be published by the said A. & B. and the said C. & D., or their heirs or successors in business," and was signed by the two firms named. The previous correspondence between the parties had informed E. that the two firms were jointly interested in a certain publication, which was an illustrated work in six volumes, of which each firm was to publish at its own expense three volumes; and it was agreed between the two firms that a part of the plates obtained from E. should be used in each of the volumes, that each firm should pay for the plates used in the volumes published by it, and that the plates should be the separate property of the firm which paid for them. E. did not

know of this agreement. *Held*, in an action by E. for breach of the contract, that the contract was a joint agreement by both firms.

Two firms executed an agreement to use all electrotypes ordered from a third person only for the purpose of illustrating works to be published by those firms, "or their heirs or successors in business," and not to sell the electrotypes to "any other parties." Afterwards one of the firms sold all its interest in the work in which the plates were to be used to the other firm, which subsequently dissolved, one of the members continuing to carry on the business. He afterwards sold the whole publication, including the electrotype plates, to A., who had no connection with either firm, and who used the plates only in the publication of the work in question. *Held*, that A. was not the "successor in business" of either firm, within the meaning of the agreement; and that the sale to him was a breach of the agreement, for which the damages recoverable were not necessarily nominal.

An agreement by the purchaser of electrotypes, to be used only for the purpose of illustrating works to be published by him, "not to sell these electrotypes to any other parties, nor to multiply them for the purpose of selling them," is an agreement in restraint of trade, but, in view of the nature of the property, is reasonable, and will be enforced between the parties to it.

An agreement, dated and signed in this Commonwealth by A., an inhabitant of the Commonwealth, to use all electrotypes ordered from B. in a foreign country only for the purpose of illustrating works to be published by A. in this country, and sent to B., who cabled to A. his acceptance of it, is to be governed by the law of this Commonwealth in determining the measure of damages in an action for its breach.

If an agreement by A. to use all electrotypes ordered from B. only for the purpose of illustrating works to be published by A. provides that he is "to be responsible for every and all wrong use of said electrotypes to the amount of any damages which may have been caused thereby to" B., "and to pay furthermore a fine to" B. "equal to the tenfold price of the wrongly used electrotypes," the fine is a penalty, which cannot be recovered, but B. is entitled to recover only the amount of damages which have been caused by a breach of the contract.

CONTRACT, for breach of the following agreement:

"The undersigned, Messrs. Estes and Lauriat and Messrs. S. E. Cassino & Co., of Boston, Mass., U. S. A., hereby agree to use all electrotypes ordered from the Bibliographical Institute Meyer, in Leipzig, only for the purpose of illustrating works to be published by the said Estes and Lauriat and the said S. E. Cassino & Co., or their heirs or successors in business, in the English language and in the United States of America.

"Estes and Lauriat and S. E. Cassino & Co. agree not to sell these electrotypes to any other parties, nor to multiply them for the purpose of selling them, and to be responsible for every and all wrong use of said electrotypes to the amount of any damages which may have been caused thereby to the Bibliographical Institute Meyer, and to pay, furthermore, a fine to the Biblio-

graphical Institute Meyer equal to the tenfold price of the wrongly used electrotypes. Estes & Lauriat. S. E. Cassino & Co. Boston, May 10th, 1883."

Trial in the Superior Court, before *Bond*, J., who directed the jury to return a verdict for the defendants; and reported the case for the determination of this court. The facts appear in the opinion.

*W. Schofield*, for the plaintiff.

*S. J. Elder & W. C. Wait*, for Estes and Lauriat.

*H. Wardwell*, for Cassino, submitted the case on a brief.

FIELD, C. J. The agreement sued on must be regarded as an agreement made by the partnerships of Estes and Lauriat and S. E. Cassino and Company with Hermann Julius Meyer, then doing business in Leipzig under the name of "The Bibliographical Institute Meyer." After this agreement had been entered into and some of the electrotype plates had been ordered and furnished through the English and Foreign Electrotype Agency, Hermann Julius Meyer took his two sons into partnership and proceeded to carry on the same business under the same name as before; and after this other plates were ordered by the defendants and furnished by the partnership. It appears by the report that "no notice was given by the plaintiff to the defendants or either of them, or by the defendants or either of them to the plaintiff, of any change in their business relations." So far as appears, the defendants did not know that the plaintiff had taken his sons into partnership, or that any other person than the plaintiff had any interest in the business carried on under the name of "The Bibliographical Institute Meyer." There is no evidence, therefore, that the defendants made any contract with the partnership composed of the plaintiff and his two sons, and the plates furnished after the formation of this partnership must, we think, as between the parties to this suit, be regarded as furnished by the plaintiff to the defendants, in pursuance of the contract. It is not a case where a stranger to a contract voluntarily undertakes to perform it. After the formation of the partnership the plates were furnished, in legal contemplation, by the plaintiff, acting through the partnership of which he was a member.

The form of the contract shows a joint agreement on the part

of Estes and Lauriat and S. E. Cassino and Company with the plaintiff. *Bartlett* v. *Robbins*, 5 Met. 184. *Donahoe* v. *Emery*, 9 Met. 63. *Boutelle* v. *Smith*, 116 Mass. 111. *White* v. *Tyndall*, 13 App. Cas. 263. There are no words in it that indicate a several liability of these two firms. The previous correspondence between the parties had informed the plaintiff that the two firms of Estes and Lauriat and Cassino and Company were jointly interested in certain publications, and the letter of Estes and Lauriat to the plaintiff, enclosing a copy of the agreement signed by the two firms, which the plaintiff was to accept or reject by telegraph, contained the following sentences, viz. : " You must understand that Messrs. S. E. Cassino & Co. have an equal interest in this publication with ourselves ; and it is a physical impossibility for us to execute any agreement by which they shall not be equally bound, and since they join us in this agreement, you have all the protection which you would have in an agreement from us alone. . . . Should you decline to accept this agreement joining Messrs. Cassino & Co. to us in your form of agreement, please cable the following words, ' Estes, Boston, No, Meyer,' and by this we shall understand that the negotiation is entirely at an end, as it is impossible for us to make any agreement which does not connect Messrs. Cassino & Co. with us in ordering these cuts for this enterprise."

The enterprise referred to was the publication of an illustrated work of Natural History, in six volumes, of which each of the two firms was to publish at its own expense three volumes. Each firm was to engage in the sale of the entire work, and was to receive for its own use the wholesale price of that part of the work published by it. It was a part of the plan between the two firms that some of the plates used to illustrate the work should be obtained from the plaintiff ; that a part of these plates should be used in each of the volumes ; that each firm should pay for the plates used in the volumes published by it, and that the plates should be the separate property of the firm which paid for them ; but it does not appear that this agreement between the two firms as to the separate property in the plates used by each firm was known to the plaintiff. As the volumes to be published were published as an entire work, although, as between themselves, the two firms owned

the separate volumes, the two firms may be said to be jointly interested in the publication.

The agreement sued on is that the defendants will use all the electrotype plates to be ordered through the plaintiff " only for the purpose of illustrating works to be published by the said Estes and Lauriat and the said S. E. Cassino & Co., or their heirs or successors in business, in the English language and in the United States of America," and they agree "not to sell these electrotypes to any other parties, nor to multiply them for the purpose of selling them, and to be responsible for every and all wrong use of said electrotypes to the amount of any damages," etc. This language literally relates to a publication by the two firms jointly, or by their heirs or successors in business, but the agreement not to sell these electrotypes to any other parties must mean to any other parties than some of themselves, and as the two firms were separate partnerships and were known to be such, the agreement must be held to confer the right upon either of the firms, and its successor in business, to use the electrotype plates for the purpose of illustrating works to be published by either firm separately, as well as the right to use the plates for illustrating works to be published by the two firms jointly, although the intention of the parties existing at the time of the making of the contract was that the electrotype plates should be used in publishing the Natural History in six volumes in the manner hereinbefore set forth.

After making this contract, it was found impracticable for the two firms to publish the Natural History together, and on September 24, 1883, Estes and Lauriat sold to S. E. Cassino and Company all their interest in the work, and delivered to Cassino and Company all materials and other articles owned by them relating to the History, and after that time Estes and Lauriat had nothing to do with the publication. At the time of the execution of the agreement sued on, the firm of S. E. Cassino and Company was composed of Samuel E. Cassino and Bradlee Whidden. On December 31, 1885, this firm was dissolved, and Cassino sold all his interest in the firm assets to Whidden; Whidden continued to carry on the business under the old firm name until about December 31, 1886, and after that continued still in business as a publisher under his own

name. On July 5, 1887, Whidden sold and delivered to Houghton, Mifflin and Company, of Boston, the property known as the " Standard Natural History," which is the name adopted for the work; " said property consisting of all the electrotype plates of six volumes as published, all duplicate cuts ever made now owned by him, the dies for binding cloth books, all stock in sheets, flat or folded, all bound stock, whether in paper parts, cloth, sheep, or half or full morocco, and the copyright of the work," and he guaranteed that the property conveyed " is free from any and all encumbrances or liens on account of copyright, or on account of any other claim or indebtedness whatsoever."

At the time of this sale all of the History had been stereotyped, and the electrotype plates for the illustrations had been soldered into the stereotype plates, and sets of the History had been printed in six large octavo volumes. The report finds that the work was the most valuable part of the assets of S. E. Cassino and Company, and was the " principal live publication " of the firm. Houghton, Mifflin and Company, after the purchase, continued the publication of the work, using also with their own imprint the printed sheets purchased of Whidden; they made some revision of the text, and continued to publish and sell the work as revised down to the time of the trial, and were then publishing it. After the revision the work was called " The Riverside Natural History "; but few alterations had been made by the revision, and it was substantially the same work as that prepared and printed by Cassino and Company. Houghton, Mifflin and Company have never made any use of the electrotype plates except in the publication of this Natural History. They had no connection with the firm of Estes and Lauriat or with Cassino and Company, and they had no other rights in the plates derived from any one, except the rights derived from Whidden by the purchase. They sold at their place of business in Massachusetts one hundred copies of the History to one Trench, of the firm of Kegan, Paul, Trench and Company of London, England, which were bound by Houghton, Mifflin and Company with the imprint of the London firm as the publishers, and these were sent to London. Subsequently the London firm found that there was some trouble about the sale of the work in Great Britain, and thirty-

eight of the one hundred copies were returned to Houghton, Mifflin and Company. It is found in the report that Houghton, Mifflin and Company had no knowledge of any restriction as to the sale of said plates, and that there was no competent evidence at the trial of any damage to the plaintiff by reason of said sale of one hundred copies.

Some evidence was introduced at the trial by the defendants, "that, by the custom of the publishing trade in Boston, a firm which purchases all the plates, sheets, and rights of publication of a work is considered the 'successor in business' of the firm making the sale, so far as that work is concerned." There has been no finding of fact on this point. It is evident, we think, that Houghton, Mifflin and Company were not in any general sense the successor in business of either the firm of Estes and Lauriat, or of Cassino and Company, or of Whidden. The original agreement contemplated that Estes and Lauriat or Cassino and Company might use the plates in any of their publications, whether made by them jointly or separately, and that the successor in business of either firm should have the same right; but this probably means that the successor to the business generally of either firm should have the same right as the firm had, not that every purchaser of the right to continue any single publication of the firm should have the right to use the plates, while the firm continued in business, and might use the plates in other publications. The sale to Houghton, Mifflin and Company did not restrict them to the use of the plates in illustrating the Standard Natural History, and therefore this evidence became immaterial.

When the Natural History had been printed by means of the stereotype plates into which the electrotype plates had been soldered, and had been published by Cassino and Company, or by Whidden, who may be regarded as the successor in business of Cassino and Company, and when the publication had been sold with the plates to Houghton, Mifflin and Company, it may be that the continuance of this publication by Houghton, Mifflin and Company, even if it were a technical breach of the agreement, could not work anything more than nominal damages to the plaintiff. The agreement, however, is that Estes and Lauriat and Cassino and Company will not sell these electrotype plates

to any other parties, and they have been sold to Houghton, Mifflin and Company, who so far as appears must be regarded as another party than the defendants, " their heirs or successors in business," and the sale must be considered as a breach of the agreement.   If the damages directly resulting from the publication of the History by Houghton, Mifflin and Company cannot be regarded as substantial, yet if by the sale Houghton, Mifflin and Company acquired the absolute property in the plates so that they can use them in any of their publications, and can multiply them and sell them to others to be used, the sale may be of substantial damage to the plaintiff.

It sufficiently appears that the plaintiff at the date of the agreement was the general owner of the plates, and of the right to multiply, sell, and use them, and that in his dealings with the defendants he required an agreement on their part that they would use them only in their own publications, and would not sell them or multiply them for the purpose of selling them, in order that he might have the opportunity of selling the plates to other persons who might wish to use them in their publications, or might be able to protect persons to whom he had already sold the right to use the plates.

It does not appear that the plates or the prints from them were protected or could have been protected by a copyright in the United States, but the plaintiff meant to accomplish much the same result, in requiring this agreement from the defendants, as could be reached under a copyright law by a license.   It is not entirely clear from the agreement whether the plates were sold absolutely to the defendants, or were let to them to be used in a particular way.   The prints after they had been published, unless protected by a copyright, could be copied by any one, and plates could be engraved and electrotype plates made, but this would be a costly process when compared with that of multiplying the plates.   We think that it must be held that the plates were sold to the defendants so that the title passed to them.   The agreement on their part not to sell them to other parties, nor to multiply them for the purpose of selling, is in the nature of an agreement in restraint of trade.   Considering the nature of the property, we are of opinion that such an agreement is reasonable, and one which ought to be enforced between

the parties to it. See *Henry Bill Publishing Co.* v. *Smythe*, 27 Fed. Rep. 914; *Clemens* v. *Estes*, 22 Fed. Rep. 899; *Parton* v. *Prang*, 3 Cliff. 537. The price to be paid for the plates, if they were to become the absolute property of the purchaser, without any restriction upon the use to be made of them, might reasonably be more than if they were purchased under such an agreement as is the foundation of this suit. It must be considered that the title of Houghton, Mifflin and Company, and their right to use the plates, are unaffected by this agreement, and therefore it is impossible to say, on the facts and evidence reported, that the defendants are liable only in nominal damages.

In determining the measure of damages the first question is whether the contract is to be governed by the law of Massachusetts or by the law of the kingdom of Saxony. We think that it is to be governed by the law of Massachusetts. The contract was signed in Massachusetts and sent to the plaintiff at Leipzig, Saxony; it did not become a contract until the plaintiff accepted it and notified the defendants of such acceptance, which he did by telegram sent to them at Boston. *Lewis* v. *Browning*, 130 Mass. 173. *Pine* v. *Smith*, 11 Gray, 38. *Hill* v. *Chase*, 143 Mass. 129. The contract relates to what is to be done by the defendants in the United States of America; the defendants are described as " of Boston, Mass., U. S. A.," and the date of the contract is Boston. We think that it must be regarded as a contract to be performed in Massachusetts, and that the law of Massachusetts, which is also the law of the forum, must determine the damages to be recovered in the action.

The provisions of the contract are that the defendants are " to be responsible for every and all wrong use of said electrotypes to the amount of any damages which may have been caused thereby to the Bibliographical Institute Meyer, and to pay, furthermore, a fine to the Bibliographical Institute Meyer equal to the tenfold price of the wrongly used electrotypes." The principal question in this part of the case is whether this fine is to be considered as a penalty. Some evidence has been introduced that by the law of the kingdom of Saxony the plaintiff, in the case of a wrong use of the electrotype plates, could recover both the damages and the fine, although there is the testimony of one jurisconsult that under that law the plaintiff is not entitled to

recover both, but can recover either one or the other, as he may elect. As by the terms of the contract the fine is in addition to the amount of any damages which may have been caused by the wrong use of the electrotype plates, it is impossible to hold that by our law the fine can be considered as liquidated damages. The amount of the fine is plainly intended as a penalty to be paid in addition to the amount of any actual damages suffered. *Higginson* v. *Weld*, 14 Gray, 165. The agreement does not provide that the damages suffered shall be considered to be tenfold the price of the wrongly used electrotype plates, but it leaves the damages to be assessed in the usual way, and provides that the fine shall be paid in addition to the damages, whatever they may be.

As under our law the fine must be considered as in the nature of a penalty, it cannot be recovered, and the plaintiff is entitled to recover only the amount of the damages which have been caused by the breach of the contract. There may be some question whether this fine was intended to cover a breach of the contract which consisted in selling the electrotype plates to other parties than the defendants, their heirs or successors in business, when the plates have not actually been used for any other purpose than that for which the defendants were authorized to use them. Whether the fine was intended to cover all breaches of the contract or not, is, however, immaterial, because as a fine it cannot be enforced. Damages are recoverable in the present suit for a breach of the agreement caused by the sale of the plates to Houghton, Mifflin and Company, and as by the purchase Houghton, Mifflin and Company have acquired the right to use the plates for any of their publications, as well as the right to multiply them and sell them to others to be used, the damages to the plaintiff cannot be said to be nominal. It appears in the copy of the papers from the Superior Court that a jury has already assessed the damages, but this is not mentioned in the report of the presiding judge, and if it is a fact we can take no notice of it. By the terms of that report the amount of the damages is to be determined by a jury, unless the parties agree to have it determined by an assessor.

*So ordered.*