## FOSBURGH v. CALIFORNIA & HAWAIIAN SUGAR REFINING CO. et al.

(Circuit Court of Appeals, Ninth Circuit. July 2, 1923.)

No. 3921.

**1. Monopolies ⬅17(1)—Contracts for sale of sugar held not invalid as in violation of Anti-Trust Law.**

Contracts by the California & Hawaiian Sugar Refining Company for sale to a candy manufacturing company of 1,250 tons of Java white sugar, from a quantity bought by the refining company to supplement its own production, *held* not invalid as in violation of Sherman Anti-Trust Act, § 1 (Comp. St. § 8820), because of a provision that "buyer agrees to use these sugars only for his own manufacturing needs and under no circumstances to resell same," the contracts having been made in 1920, when the Lever Act was still in force and there was a shortage of sugar, and it appearing that the provision was inserted at the suggestion of government officers having to do with the enforcement of food regulations for the purpose of preventing hoarding for speculative purposes, and to confine the sale of Java white sugar, which was not popular for domestic use, so far as possible to manufacturers, and leaving a greater quantity of the better sugars for domestic use.

**2. Monopolies ⬅12(1)—Rule of reason to be applied in construction of contract.**

In *determining* whether a contract is in violation of Sherman Anti-Trust Act (Comp. St. § 8820 et seq.), unless the contract is on its face violative of the act, the inquiry must be extended to the circumstances and conditions under which it was made, including the relationship of the parties and their relation to the subject-matter dealt with, and its relation to the general public.

**3. Contracts ⬅116(1)—Manufacturer or trader may restrict sales to customer as to quantity.**

A trader or manufacturer engaged in private business, not of a public or quasi public character, may sell to whom he pleases, and may restrict his sales to a customer as to quantity, if his contracts are not in violation of any law made for the protection of the public.

**4. Monopolies ⬅17(1)—Sale contract limiting quantity buyer may purchase held not in violation of Anti-Trust Law.**

Contracts by a sugar refiner for sale of sugar to a candy manufacturer *held* not in violation of the Sherman Anti-Trust Act (Comp. St. § 8820 et seq.) because of a provision that the sales made should constitute all that the buyer was entitled to purchase from the seller before the end of the calendar year.

Appeal from the District Court of the United States for the Second Division of the Northern District of California; Benjamin F. Bledsoe, Judge.

Suit in equity by James B. A. Fosburgh, trustee in bankruptcy of the Continental Candy Corporation, against the California & Hawaiian Sugar Refining Company and others. Decree for defendants, and complainant appeals. Affirmed.

For opinion below, see 270 Fed. 302.

This suit was instituted December 1, 1920, by the Continental Candy Corporation against the defendants, appellees herein, for the purpose of canceling and having annulled and held for naught two certain contracts, theretofore entered into by and between the candy company and the defendant California and Hawaiian Sugar Refining Company, bearing date, respectively, May 14 and May 18, 1920. The candy company having become bankrupt, its trustee, James B. A. Fosburgh, has been substituted as plaintiff.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

These contracts are of like tenor, and are for the sale by the sugar company to the candy company, the first of 750 tons and the latter of 500 tons, white Java sugar, at $19.85, net cash, duty paid, landed weights, f. o. b. cars, San Francisco, Cal. The second, sixth and seventh conditions of the contracts are as follows:

"(2) Payment.—Buyer agrees to immediately establish an irrevocable letter of credit through San Francisco bank sufficient to cover the amount of this purchase, same payable on presentation at said bank of invoice and shipping documents by the seller, the California & Hawaiian Sugar Refining Company. In the event of shipping documents being delayed at time of arrival of steamer, the payments are to be made against seller's delivery order."

"(6) Buyer agrees to use these sugars only for his own manufacturing needs and under no circumstances to resell same."

"(7) Sales of this sugar to manufacturers constitutes their quota of sugar from the California & Hawaiian Sugar Refining Company from delivery date of these Java whites until the end of the year."

In payment for the sugar, through arrangement and agreement of the parties to the contract, irrevocable letters of credit were issued, in the one case by the First National Bank of Chicago, and in the other by the Great Lakes Trust Company, to the sugar company, authorizing it to value on the bank or company, as the case might be, at sight, for any sum or sums not exceeding the contract value of the sugar sold; it being further stipulated on the part of the First National Bank of Chicago that drafts drawn under its letter of credit might be paid at the counter of the First National Bank of San Francisco, and, on the part of the Great Lakes Trust Company, that such drafts drawn under its letter of credit might be negotiated and paid at the Canton Bank of San Francisco.

Several reasons are assigned by the complaint why recovery should be had by plaintiff, among others, that clauses 6 and 7 of the contracts for the sale of the sugar contravene the anti-trust laws of the United States, and that thereby the contracts themselves are rendered illegal and unenforceable.

Along with the prayer for recovery, injunction was sought, restraining the sugar company from delivering to plaintiff the sugar sold to it, or from drawing on the letters of credit, or from taking payment from the San Francisco banks; also restraining the San Francisco banks from paying the sugar company the price of the sugar during the pendency of the suit.

While the defendants admit the making of the contracts and the issuance of the letters of credit as set forth in the complaint, the sugar company and the San Francisco banks controvert the alleged legal effect of such contracts, and declare their entire validity and plaintiff's liability to pay the stipulated value of the sugar sold.

John S. Partridge and Ira S. Lillick, both of San Francisco, Cal., and Charles Leroy Brown, of Chicago, Ill., for appellant.

Donald Y. Campbell and Garret W. McEnerney, both of San Francisco, Cal., for appellee Sugar Co.

H. U. Brandenstein, of San Francisco, Cal., for appellee Canton Bank.

Cushing & Cushing, of San Francisco, Cal., for appellee First Nat. Bank of San Francisco.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). Motion was presented at the hearing to dismiss the appeal, on the ground that, subsequent to the entry of the decree in the District Court, the sugar company had drawn against the letters of credit for the purchase price of the sugar, and that the draft had been duly honored and paid. As, however, the motion does not seem to be strenuously

insisted upon, we waive it, and proceed to a decision upon the merits of the cause.

[1] Substantially but one question is presented for consideration, which is whether, by reason of the presence of clauses 6 and 7, the contracts contravene the anti-trust laws of the United States, and are thereby rendered void and unenforceable. The act known as the Sherman Anti-Trust Act (26 Stat. 209 [Comp. St. § 8820 et seq.]) contains the embodiment of the law upon the subject of unlawful restraint of trade and monopolies. By the first section the Congress denounces every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce, and by the second monopolies, or any attempt to monopolize any part of the trade or commerce among the several states or with foreign nations.

The second section has been construed by the Supreme Court as "intended to supplement the first and to make sure that by no possible guise could the public policy embodied in the first section be frustrated or evaded." Standard Oil Co. v. United States, 221 U. S. 1, 60, 31 Sup. Ct. 502, 516 (55 L. Ed. 619, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912D, 734). Thus harmonized, the Supreme Court further declares that "it becomes obvious that the criteria to be resorted to in any given case, for the purpose of ascertaining whether violations of the section have been committed, is the rule of reason guided by the established law and by the plain duty to enforce the prohibitions of the act and thus the public policy which its restrictions were obviously enacted to subserve," and that "freedom to contract was the essence of freedom from undue restraint on the right to contract," and again that "it is obvious that judgment must in every case be called into play in order to determine whether a particular act is embraced within the statutory classes, and whether, if the act is within such classes, its nature or effect causes it to be a restraint of trade within the intendment of the act." Thus was applied the rule of reason as a criterion by which to determine whether, in any given case, there had been a violation of the anti-trust statute, and it was reaffirmed in United States v. American Tobacco Co., 221 U. S. 106, 180, 31 Sup. Ct. 632, 55 L. Ed. 663.

[2] This means that, unless the contracts or engagements are, within themselves and upon their face, inherently violative of the act, the inquiry must be extended to the circumstances and conditions under which the contracts were formulated and entered into, including the relationship of the parties, and their relation to the subject-matter dealt with, and its relation to the general public. As was said in Nash v. United States, 229 U. S. 373, 376, 33 Sup. Ct. 780, 781 (57 L. Ed. 1232):

"Those cases [Standard Oil and Tobacco] may be taken to have established that only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade."

That the contracts are not inherently illegal, because of clause 6, so as to bring them within the elementary rule that courts will not exert their powers to enforce illegal contracts or to compel wrongdoing, is

determined by Wilder Mfg. Co. v. Corn Products Co., 236 U. S. 165, 172, 173, 35 Sup. Ct. 398, 400 (59 L. Ed. 520, Ann. Cas. 1916A, 118), wherein it was held that similar language was not to be so construed; the court declaring:

"But we can see no ground whatever for holding that the contract of sale was illegal because of these conditions."

The Wilson Act, as amended (U. S. Comp. Stat. § 8831) is not more comprehensive in its scope than the Sherman Act, and serves only to make the law more specific in its application, as it relates to foreign commerce.

Let us turn now to the facts relating to the conditions present, and the probable reasons and motives that induced the entering into the contracts in suit. War conditions respecting food regulations were still prevailing. Although the Armistice had been declared, there had been no final declaration of peace between this country and Germany. Conditions were still such that food regulations were essential to insure a proper and fair distribution of certain food products, including sugar. Under and in pursuance of the Lever Act (40 Stat. 276), known as the Food Control Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛e, et seq.), and the proclamation of the President duly authorized thereto, the United States Food Administration was created, and a Food Administrator appointed. Later, namely, on November 21, 1919, the President, by proclamation (41 Stat. 1774), transferred all the powers and authority theretofore vested in the Food Administrator, in so far as they applied to food products other than wheat and wheat products, to the Attorney General of the United States, who was authorized and enjoined to direct and carry into effect the provisions of said act and the powers of authority therein given to the President. So that the Attorney General, in so far as it related to the enforcement of food regulation and distribution, save as to wheat products, superseded the Food Administrator, and thenceforth proceeded to the exercise of his appropriate powers.

Among other things, all persons engaged in the importation, manufacture, or distribution of sugar were, by proclamation of the President of date October 8, 1917 (40 Stat. 1700), required to obtain licenses, and, in pursuance of such requirement, the defendant sugar company obtained a license, and continued to hold it until all licenses were abolished by proclamation effective November 15, 1920 (40 Stat. 1807). On November 1, 1917, there were promulgated by the Food Administration certain general rules to control the sugar trade, as well as trade in other commodities, among which was rule 6, which reads as follows:

"*Resales within Same Trade Prohibited, When.*—The licensee, in selling food commodities, shall keep such commodities moving to the consumer in as direct a line as practicable and without unreasonable delay. Resales within the same trade without reasonable justification, especially if tending to result in a higher market price to the retailer or consumer, will be dealt with as an unfair practice."

The defendant, the sugar company, was engaged, as its principal business, in refining Hawaiian sugar, and it disposed of its product in

the main, if not wholly, to wholesale dealers. In the usual course of business, these, of course, sold to retailers, and they to the consumer. Early in the year 1920 there was an apparent shortage of sugar, owing in part to a strike in the Hawaiian Islands, and the government so voiced it. Brown, the sales manager of the sugar company, testifies:

"We bought sugar to aid our customers to have sufficient supplies."

Among the rest, the company bought 10,000 tons of Java white sugar, to be shipped to San Francisco during the months of August, September, and October. This sugar is not popular with the housewife, and in America it is generally used for manufacturing purposes. From this consignment of sugar, the sugar company made the sales to the candy company evidenced by the contracts in question. The candy company was unable to obtain any cane or beet sugar contracts for fall delivery at a fixed price, and made the purchase of the sugar company through a brokerage firm, who represented that the sugar company could not sell any sugar, except under contract containing clauses 6 and 7. It is a fact that these clauses were used by the sugar company only in contracts for the sale of Java white sugar. They were never used in sales of the refined sugar. Mr. Brown further testifies, respecting the sales of this sugar:

"We were instructed (through the Department of Justice) to confine the sale of Java whites to manufacturers, in order to release a larger amount of our regular refined to the consuming public. Pursuing this course, it would enlarge the quantity of sugar available in the household to the extent that the manufacturer could not call on me for my refined sugar. Not only through the directions of the government, but as a sugar man, I knew that that would be the effect. By selling to manufacturers, and by forbidding them to resell, we sought to bring about the use of Java whites by them which the householder would not take, owing to its forbidding aspect."

When asked if that was the only motive for requiring the buyer to agree "that it was for his own consumption, and not for the purpose of resale," the witness answered:

"As far as I know, it was merely trying to follow out the rules of the Department of Justice."

He further asserts that clause 6 was put in the contract on the verbal say-so of Mr. Montgomery, a special agent of the Department of Justice, and Mr. Miller, who was chairman of the Fair Trade Commission. As somewhat indicative of the motive and purpose of inserting clauses 6 and 7 in the contracts, we may be pardoned for quoting rather extensively from the testimony of Mrs. Annette Adams, who was at the time United States District Attorney at San Francisco. She relates:

"We were endeavoring, as a part of our work in reducing the high cost of living and enforcing the Lever Act, to bring about the same equitable distribution of sugar that had been had under the Food Administration and the Sugar Equalization Board. There was no legal provision that the sugar should be so distributed, but the refiners agreed with us that they would, as far as possible, continue their allotment of sugar, giving their customers proportionate parts, that portion to depend upon the business which they had transacted with them theretofore. In other words, each wholesaler, when a particular lot of sugar was ready for distribution, was to have his proportionate share of that sugar. And we were endeavoring to prevent any whole-

saler or any retailer or any manufacturer from hoarding sugar; that is, from obtaining a portion or contracting for a greater supply of sugar than he needed for his immediate needs, for his reasonable use, for a reasonable time, which is the language of the act. In order to do that, the co-operation of the refiners was necessary and important. * * * Now, I recall that some time during the spring * * * Mr. Montgomery discussed with me the proposition of the Hawaiian Sugar Company selling some Java sugar to some manufacturers in the Middle West, and asked if we could have any objection to that sale. * * * We took this matter under consideration, and there was a discussion on between Mr. Miller and myself about it, and between Mr. Montgomery and myself about it, and finally we agreed that we would offer no objection to their forwarding it, if they would see to it that that sugar went into the hands only of the consumer; in other words, that it would not go into speculative channels. * * * And therefore that agreement was made by the sugar people, that if they sold this sugar they would see to it that the sugar went into the hands of bona fide consumers, and not the hands of dealers who would resell it. * * * In the term 'consumer' I include a manufacturer of candy. The ultimate consumer, in our idea, was the housekeeper and the manufacturer. * * * We regarded them as consumers. * * *

"In general, the rules and regulations were those that were laid down by the Food Administration—that sugar must go in a direct line from the refiner to the consumer; that if the sugar was sold to a manufacturer, it would go, might go, from the refiner direct to the manufacturer; if it was sold to a wholesaler, it must go from that wholesaler direct to a consumer, or to a retailer, and from the retailer it must go into the hands of a consumer; and that there should be no resale by any person to whom that sugar was sold as one in the chain of handlers. In making the statement that there was no legal requirement, I am just quoting the rules and regulations that come under the unfair practices provision, and then, of course, there was the hoarding provision always in force. That was held to support us by our construction. Our construction was 'more than reasonable needs for a reasonable period.' * * * We only consented to this sale to the manufacturer on the understanding and assurance to us * * * that this was an ultimate consumer and not a seller. * * *

"Our rule was to prevent him from securing a surplus, not to prevent him from selling it, but our rule was to prevent him from getting it in the first place. * * * Agreement with the refiners was that the refiners should not sell to persons who were not bona fide manufacturers. * * * I am stating what the probabilities were, and what limitations were put upon the Hawaiian Sugar Company in selling this sugar to the Middle West people. * * * The Food Administration rules were in a sense in effect. We used them as a guide, and we required that the people should live up to those rules and regulations. Of course, if they wanted to engage in the sugar business, they had to secure a license. Licenses were issued from Washington, but, of course, application for license renewals in many instances came through us, and we recommended or refused recommendations that they be granted."

It may be further noted that the whole of the 10,000 tons of Java whites, thus purchased by the sugar company, was sold under contracts of like tenor as those in suit. Now, to construe these contracts in the light of reason: The candy company, as appears, was engaged in the manufacture of candy; and, when clause 6 specifies the use of the sugar for its own manufacturing needs, it relates to the manufacture thereof into candy. It was not to resell the sugar purchased, except as it sold the candy product. In a sense, the agreement, considered in the abstract, is not without a tendency to restrict the absolutely free movement of sugar in ordinary trade relations.

But the inquiry does not stop here. Does it, considered in view of

the circumstances attending the making of the agreement, work a prejudice to the public by unduly restricting competition, or unduly obstructing the course of trade? Meyer v. Estes, 164 Mass. 457, 41 N. E. 683, 32 L. R. A. 283, involved an agreement on the part of the purchaser not to sell certain electrotype plates to other parties, nor to multiply them for the purpose of sale, and the court said:

"Considering the nature of the property, we are of opinion that such an agreement is reasonable, and one which ought to be enforced between the parties to it."

The present case involves a much broader inquiry. The entire community, in fact, the government itself, was vitally interested in bringing about a state of affairs, if practicable, that would occasion the freest movement possible of sugar from its source of production to the consumer; a principal purpose being to avoid hoarding at all points along the line, and the accumulation of stores, for the purpose of boosting the market to the disadvantage of the user. Lever Act, § 4 (40 Stat. 277), specifically authorizes such a policy.

The government having undertaken the surveillance of the movement of food products, it assumed to direct and oversee, to a certain extent, the manner in which such products should be distributed throughout the entire community, and, in the exercise of its function in that regard, even directed, or at least suggested, the style of contracts that should be entered into in the sale and purchase of such commodities, and in the present instance, as the evidence clearly shows, indicated a preference that clauses 6 and 7 be comprised in the contracts in question. Furthermore, it was in obedience to such suggestion that the sugar company introduced the clauses. Sugar was scarce at the time, and prices were inflated, and it was the idea of the sugar company, as well as of the officials of the Department of Justice, that if the Java whites went to the candy company, or to those using sugar for manufacturing purposes, it would leave a larger quantity on the market for distribution, to reach the consumer.

Parenthetically, it should be said, the manufacturer, where sugar was required as an ingredient to create the product, was regarded as a consumer, because, if not so regarded, such producers as candy makers, fruit canners, and the like, would not be able to carry on their business, and thus supply the needs of the public in their line. So that, while it was true that free competition, as it respects the sugar commodity in the market, was somewhat interfered with, who can say that the policy adopted by the Food Administration, and later pursued by the Department of Justice, and, at its suggestion, conformed to by the defendant sugar company in entering into the contracts in question, was one which was prejudicial to the public interests, in that it unduly restricted competition, or unduly obstructed the course of trade? Surely it was not the intent or purpose of the contracting parties thus to impinge upon the element of competition, or interfere with the regular course of trade. They, together with the Food Administration, were acting under a dire necessity, imposed upon the community by a state of war, and the community, in the interests of humanity, could be adequately supplied only through the method adopted, or some other hav-

ing a like purpose in view. At least, that was the sincere opinion and belief of the actors in inducing the regulations adopted, and in the impulse for carrying them into effect.

There was ample reason for such belief. The times were unusual, conditions were seriously out of order, currents of trade had been and were being subverted, and profiteering was rampant—all tending to the concentration of the control of market prices in the hands of the few, which boded evil to the consumer, through, as experience had shown, the boosting of prices, and an unequal and unfair distribution of food products. The effort was therefore to combat, in a measure at least, these unhealthy trade conditions and relations, and to procure for the consumer his equitable share of some of the necessities of life, at fair and reasonable prices, if possible; and, while the effort must be conceded to have had the effect to control or impinge upon, to some extent, the existing unhealthy trade relations and conditions, this is far from granting that the course pursued, in the light of all the attending conditions and circumstances, unduly obstructed the course of trade, or unduly restricted competition, prejudicially to the interests of the public. We are not satisfied that it did. On the contrary, we are impelled to the view that it did not.

We conclude, therefore, that the contract is not, because of the presence of clause 6 thereof, one inimical to section 1 of the Anti-Trust Act; nor does it evidence an attempt to monopolize trade relations between the states or with foreign nations, as the second section is construed by the Supreme Court in the Standard Oil and Tobacco Company Cases.

[3] The seventh clause is of a different nature, and involves the right of the sugar company to limit the amount of its sales, in respect of quantity, to its purchasers, or any or all of them. It is settled law that a trader or manufacturer engaged in private business, not of a public or quasi public character, may sell to whom he pleases, may charge different prices for the same article to different individuals, and may make such discrimination in his business as he chooses. United States v. Freight Association, 166 U. S. 290, 320, 17 Sup. Ct. 540, 41 L. Ed. 1007. This, of course, with a restriction that his contracts shall not be in violation of law, imposed for the protection of the public. The doctrine as it relates to the anti-trust laws has been recently reannounced by the Supreme Court, in United States v. Colgate & Co., 250 U. S. 300, 307, 39 Sup. Ct. 465, 468, 63 L. Ed. 992, 7 A. L. R. 443, as follows:

"The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word, to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long-recognized right of trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell."

If a manufacturer may sell to whom he pleases, it is entirely logical that he may restrict his sales as to quantity, and sell to his customers

such quantities as he may see fit. This must be the general rule, and, as such, effective, unless the contract stipulating such terms, by reason of its intendment, in some relation impinges upon the restriction of the anti-trust laws.

[4] It is manifest that clause 7 does not so impinge upon any phase of such laws; and, applying the rule of reason, like considerations must follow as we have found apposite to clause 6, and it must be further held that the contracts in question are not rendered void because of the presence therein of clause 7.

A point is made in behalf of plaintiff that the United States District Attorney at San Francisco was without power or authority to suggest or direct the manner in which the contracts should be drawn, or the provisions which they should contain. This is without force. What was being done in the way of furthering the policy of the government to secure, if practicable, a fair and equitable distribution of sugar among the ultimate users, was by authority of the Attorney General. The United States attorney at San Francisco, and Montgomery, Miller, and others, were in the service of the Department of Justice and the Fair Trade Commission. It can scarcely be denied that these organizations were clothed with ample authority to pursue the policy adopted, if in subordination of the injunctions of the anti-trust laws of Congress. As we have seen, these contracts do not contravene the interdiction of such laws.

We find no error in the decree rendered, dismissing the suit, and therefore affirm the same.