INDEPENDENT IRON WORKS, INC.,
a corporation, Plaintiff,

v.

UNITED STATES STEEL CORPORATION, Bethlehem Pacific Coast Steel Corporation, Bethlehem Steel Company, and Kaiser Steel Corporation, Defendants.

Civ. No. 35080.

United States District Court
N. D. California, S. D.
Sept. 30, 1959.

Hildebrand, Bills & McLeod, Clifton Hildebrand, Oakland, Cal., Caplan, Berlin, O'Grady & Doll, Julian Caplan, San Francisco, Cal., for plaintiff.

McCutchen, Doyle, Brown & Enersen, Morris M. Doyle, John N. Hauser, and Frederic A. Sawyer, San Francisco, Cal., for defendant United States Steel Corp.

Pillsbury, Madison & Sutro, James Michael, George A. Sears, and William C. Miller, San Francisco, Cal., for defendants Bethlehem Pacific Coast Steel Corp. and Bethlehem Steel Co.

Thelen, Marrin, Johnson & Bridges, Max Thelen, Jr., and Gordon Johnson, San Francisco, Cal., for defendant Kaiser Steel Corp.

WOLLENBERG, District Judge.

This is a private antitrust action for treble damages. Plaintiff is a fabricator and erector of structural steel, located in Oakland, California. The defendants, against whom the case proceeded to a jury trial (all other defendants having been dismissed) are United States Steel Corporation, the affiliated companies of Bethlehem Steel Company and Bethlehem Pacific Coast Steel Corporation, and Kaiser Steel Corporation.

The complaint, originally filed on November 28, 1955, and subsequently amended, alleges three causes of action. The first and second counts charge a conspiracy between the several defendants, under sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2, to restrain and monopolize or attempt to monopolize [1] trade in the sale of structural shapes and plates and in the fabrication of structural steel. The crux of plaintiff's claims is that it was unable to purchase from the several defendants all of the structural steel products it desired during the period in suit, i. e., January 1, 1955, to November 28, 1955. The third count is against United States Steel alone, charging a conspiracy with Southern Pacific Company (not named a defendant) to prevent free and competitive bidding on railroad car underframes, in violation of section 10 of the Clayton Act, 15 U.S.C.A. § 20.

Numerous pretrial conferences were held during which the factual and legal issues were extensively explored. Each of the parties presented both orally and in detailed memoranda a full exposition of their respective positions. These proceedings eventuated in the court's pretrial order of June 19, 1959, defining the issues and the scope of proof at trial.

Plaintiff, at the trial, first presented its evidence on the issues of violation of the antitrust laws. When plaintiff rested its case on liability, defendants severally moved to dismiss the first and second causes of action under Rule 41(b) and for directed verdicts under Rule 50(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. United States Steel similarly moved with respect to the third cause of action.

In passing upon these motions, several preliminary observations are warranted.

This case involves only a fragment of the steel industry in the United States. It centers on structural shapes and plates sold by the defendants for use in the fabrication of structural steel in the seven Western States. The distribution of the total ingot tonnage of all types of steel produced by the several defendants is not relevant to this action. Such inquiries are not germane to the simple issue here of whether or not defendants conspired to limit supplies of *structural* steel sold to plaintiff in this competitive area.

Plaintiff bases its claim on acts of defendants in the year 1955 up to November 28th.[2] Plaintiff does not claim

---

1. Plaintiff's alternative claims of *independent* monoplization and individual attempts to monopolize by each of the defendants find no support in the evidence.

2. Plaintiff's cause of action, being founded upon an alleged continuing conspiracy and repeated refusals to sell, comes within the purview of the Ninth Circuit's de-

damages for acts of defendants prior to January 1, 1955, since plaintiff settled prior litigation and executed a release of all claims existing as of December 31, 1954.

At pretrial, plaintiff stipulated to confine its proof to certain designated jobs in the year 1955 but desired additionally and for background purposes to introduce evidence of certain pre-1955 jobs. Accordingly, for the limited purpose of attempting to establish the prior existence of the alleged conspiracy, the court permitted evidence pertaining to the 13th Street Freeway and Teaching Hospital jobs. Such pre-1955 evidence was not admitted against Kaiser. Plaintiff stipulated (Tr. 951–952) that "up to February 1, 1955, Kaiser Steel Corporation met the requirements of Independent · Iron Works as Independent Iron Works called on them to do so, in quantity, in time, and also was a good, adequate and prompt supplier." The undisputed evidence respecting these two pre-1955 jobs contradicts, rather than supports, plaintiff's claim of conspiracy. Plaintiff's purchasing agent admitted that Bethlehem "offered quite a considerable tonnage of plate" when he needed it; indeed, Bethlehem offered plaintiff a larger tonnage than plaintiff chose to accept. Additionally, Bethlehem's delivery performance with respect to the 13th Street Freeway job was better than that of Kaiser, who plaintiff stipulated met plaintiff's requirements in quantity and on time. These undisputed facts leave no room for any inference of a conspiracy to withhold steel from plaintiff.

The U. C. Teaching Hospital job was fabricated by the Moore Dry Dock Company, who received the job at the inception of the Korean War in 1950. Mr. J. R. Moore, vice president of that company, called as a witness by plaintiff, testified that wartime demands for steel, Government controls, and his inability to obtain priorities for this job affected Bethlehem's [3] ability to fill Moore's orders. Mr. Moore further testified that in the face of these problems "Bethlehem nevertheless made a definite effort to try to help out Moore Dry Dock Company in supplying steel for it for the U. C. Hospital job." This is demonstrated by the fact that during the years when Moore was fabricating the job it received about three times the tonnage of steel it had bought from Bethlehem in prior years. Here again these undisputed facts repudiated any reasonable suggestion of a conspiracy to withhold steel.

Turning then to 1955, plaintiff relies exclusively upon the defendants' alleged similar conduct as the basis for drawing an inference of conspiracy.

On these motions plaintiff is entitled to and must receive the benefit of all favorable inferences which can be drawn from the evidence. The plaintiff, however, still has the burden of establishing a prima facie case. He must rely upon reasonable and logical inferences from the evidence in the record. Plaintiff cannot go to the jury on the basis of speculation, surmise or conjecture. Wolfe v. National Lead Company, 9 Cir., 1955, 225 F.2d 427, 433–434.

In following these principles in the instant case, the court's way has been made easier by the remarkable absence of any real conflicts in the evidence. Despite the size of the record, the basic facts are not in dispute.

In deciding whether evidence of defendants' conduct can reasonably support an inference of conspiracy, there must be more than mere general similarities; there must be a sameness of conduct under circumstances which logically suggest joint agreement, as distinguished from individual action. Proof of parallel business conduct is not a substitute for proof of conspiracy, and similar conduct, as such, does not establish conspiracy.

cision in Flintkote Company v. Lysfjord, 9 Cir., 1957, 246 F.2d 368 certiorari denied, 1957, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46; accordingly, evidence of postcomplaint acts was inadmissible.

3. Notably the evidence with respect to this job is silent as to U. S. Steel and plaintiff stipulated that pre-1955 evidence was not offered against Kaiser.

Theatre Enterprises, Inc. v. Paramount, 1954, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273. As stated in United States v. Borden Co., D.C.N.D.Ill.1953, 111 F.Supp. 562, 579: "Reasonable businessmen will act similarly when presented with the same problem." The antitrust laws were not meant to prohibit businessmen from adopting sound business policies merely because competitors had already adopted the same or a similar policy.

■ An inference of conspiracy is permissible only where the conduct was adopted by a competitor "in apparent contradiction to its own self-interest." Milgram v. Loew's Inc., 3 Cir., 1951, 192 F.2d 579, 583. An inference of conspiracy would only arise from similar business conduct if it appeared more to the interest of competitors to adopt different practices. Chorak v. RKO Radio Pictures, 9 Cir., 1952, 196 F.2d 225, 229, certiorari denied, 1952, 344 U.S. 887, 73 S.Ct. 329, 97 L.Ed. 702.

These are the general standards against which can be measured plaintiff's factual contentions in this case, recognizing always, however, that plaintiff is entitled to the benefit of all reasonable inferences which may be drawn from the evidence in this record.

Plaintiff first contends that the nationwide shortage of steel which commenced in the middle of 1955 was "artificially" created by the defendants. The undisputed facts, however, are to the contrary. The demand for structural steel products increased tremendously in the second quarter of 1955. The demand quickly outstripped the available supply. The customers' orders greatly exceeded the defendants' productive capacity.

Published and uncontradicted statistics show that the bookings of fabricated structural steel arose from 3,161,611 tons in 1954 to 4,651,312 tons in 1955, an all-time record. On the production side, similar published and uncontroverted statistics demonstrate that the steel industry was operating at close to 100% of capacity throughout most of 1955. During the shortage defendants were engaged in maximum production efforts.

■ Such uncontradicted evidence leaves plaintiff's theory of "artificial" shortage without support. " * * * one must always measure what is claimed by plaintiff to have theoretically happened against what is mathematically proved by defendants to have actually happened." United States v. Natl. Malleable & Steel Castings Co., CCH Trade Cases, par. 68, 890 (N.D.Ohio 1957), affirmed per curiam 1958, 358 U.S. 38, 79 S.Ct. 39, 3 L.Ed. 2d 44.

■ Plaintiff next seeks to support its claims by the fact that each of the defendants is vertically integrated. That is, each defendant not only manufactures structural shapes and plates but also operates fabricating shops which use those products in competition with the plaintiff and other fabricators. United States Steel and Bethlehem have had such fabricating facilities for many years; Kaiser acquired its facilities in 1955. There is no evidence in the record that any defendant acquired any facilities pursuant to understanding or agreement with any other defendant. The mere fact that each defendant is vertically integrated does not support an inference of conspiracy. Vertical integration is clearly legal. United States v. Columbia Steel Co., 1948, 334 U.S. 495, 525–526, 68 S.Ct. 1107, 92 L.Ed. 1533.

■ Plaintiff further argues, however, that each defendant supplied disproportionately large quantities of steel to its own fabricating shops. Even if true, this alleged favoritism of defendants' own fabricating shops would suggest normal, rather than conspiratorial conduct. In Dipson Theatres v. Buffalo Theatres, 2 Cir., 1951, 190 F.2d 951, 960, 961 certiorari denied 1952, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 691, the court in commenting on the evidence that "it was the policy of each [defendant] to favor theatres in which they had an interest," said, "This was to be expected, and the *fact that they did so is no evidence that they conspired to do so jointly rather than doing so individually*"; they "could legally favor their own theatres" (emphasis added).

748

In any event, undisputed facts refute plaintiff's argument. Over the years the defendants' respective shares of the national fabricating market have been declining. Moreover, during the shortage each defendant's fabricating shops were rationed in the same manner as other customers and faced the same problems of operating within their limited supplies.

The crux of plaintiff's claim is that during the shortage in 1955, each defendant refused to sell plaintiff all the steel it wanted to purchase. Plaintiff would draw an inference of conspiratorial refusals from allegedly "parallel conduct" in that each defendant, in rationing its available supply, gave some consideration to its customers' past purchases.

■ It is settled law, however, that each defendant, acting individually, was legally entitled to sell or not to sell to any customer or to sell him as much as he saw fit. Times-Picayune Pub. Co. v. United States, 1953, 345 U.S. 594, 625, 73 S.Ct. 872, 97 L.Ed. 1277.

"If a manufacturer may sell to whom he pleases, it is entirely logical that he may restrict his sales as to quantity, and sell to his customers such quantities as he may see fit." Fosburgh v. California & Hawaiian Sugar Refining Co., 9 Cir., 1923, 291 F. 29, at pages 36–37.

And "an allocation system alone, without further factors, is not inherently illegal as a method of distribution in times of scarce supply." Banana Distributors v. United Fruit Company, D.C.S.D.N.Y. 1958, 162 F.Supp. 32, 42.

The Banana case recognizes the logic and good business sense of some method of rationing in a shortage period. Any other approach, as the testimony here shows, would leave many customers with no steel at all. The broad similarity of business conduct, in the sense that each defendant considered as one factor of its distribution policy its respective customers' past purchases, is not the kind of "parallel conduct" which will support an inference of conspiracy. Past purchases afford a logical and reasonable guide for distribution during a shortage period.

Wholly apart from this broad similarity, however, the evidence shows dissimilarities in the actual methods each defendant followed which militate against any suggestion of "parallelism."

United States Steel's method was more formalized and mathematical than the methods of the other defendants. The tonnages of steel which each customer could order from each of its mills—so-called "entry limits"—were calculated with reference to the customers' purchases in 1953, 1954 and the first six months of 1955. The customer was notified in advance as to what his tonnages would be for the following quarter. These entry limits were generally intended as the maximum amounts which a particular customer could purchase. Exceptions, however, were made—notably in plaintiff's case—where the customer received additional tonnages.

Bethlehem's method differed from the methods of the other defendants. It was unique in that it differed within the Bethlehem organization itself. In considering past purchases as one of the factors affecting sales during the shortage, the top sales management reviewed sales records over a number of years in making broad decisions covering all types of steel products; at the next level the product manager for plates looked exclusively to 1954, whereas the product manager for structural shapes started out using 1954 but later on took into account 1952 and 1953 as well as 1954; Mr. Cort, in charge of sales on the West Coast, was not bound by any of these recommendations but made his own determinations. In the case of plates he followed the product manager's recommendation and used 1954; in the case of structural shapes he considered customers' purchases in 1953 and 1954, to the end of providing each customer with the largest tonnage he had bought in either of those years. In all instances Bethlehem's consideration of a customer's prior purchases was intended to provide a minimum of monthly tonnage.

The tonnages which Kaiser provided its customers were for the most part

worked out by direct negotiation with the customer. To the extent it gave consideration to past purchases, it looked to the year 1954. Kaiser, unlike the other defendants, frequently gave so-called "job protection," i. e., an assurance to furnish all of a particular type of steel needed by a customer for a specific job.

Other differences in the defendants' respective distribution methods are undisputed in the record. The foregoing examples are sufficient to illustrate that as soon as generalities are put aside, the many divergencies in the defendants' practices show such a lack of "parallel conduct" as to negate any inference of agreement. Indeed, plaintiff's own purchasing agent testified, "that 1955 was a very confusing year insofar as allocations, and *various mills operated differently*" (emphasis added).

Plaintiff repeatedly urges that its total receipts of steel were lower in 1955 than in 1954. Yet the undisputed testimony shows that when steel was in ample supply at the end of 1954 and during the first part of 1955, plaintiff placed very few orders. Accordingly, its receipts were low in the first half of 1955.

█ In this regard the admissions made by plaintiff's purchasing agent while under cross-examination also are illustrative. Job by job, order by order, and shipment by shipment the witness admitted, on cross-examination, that Bethlehem had accepted all orders tendered by plaintiff for steel, had filled all such orders, and that Bethlehem's performance was satisfactory. Similar, though less detailed, admissions were made regarding the performances of United States Steel and Kaiser. Thus, plaintiff's own evidence flatly refutes the existence of any conspiracy to withhold steel from plaintiff.

In much the same vein is the evidence regarding the claimed lateness of deliveries. The defendants admit that there were some minor delays in the shipments of plaintiff's orders. The evidence explaining the causes of such delays is not disputed. Steel strikes, shipping strikes, and other unavoidable circumstances

such as an unprecedented flood at the Bethlehem mill and interferences in production due to efforts to expand capacity reasonably account for the delays that occurred. Indeed, in the light of such circumstances, the extent of the delays appears minimal. For example, the admissions of plaintiff's purchasing agent show that only 4% of Bethlehem's shipments were late and these were justifiably explained by the circumstances previously mentioned.

Two further matters in connection with the first and second causes of action warrant mention.

Plaintiff also contends that the defendants conspired to take fabricating jobs away from the plaintiff by reducing the prices they quoted to general contractors after the bidding. Out of 835 jobs which plaintiff bid on in 1955, it offered evidence of only two alleged instances of such bidding practices. In one case Kaiser had been unable to get its quotation to the successful general contractor prior to the opening of the bids. The contractor rejected Kaiser's offer and awarded the job to plaintiff. In the second case Bethlehem had bid a job to a contractor in two parts and after the bidding had inquired of the contractor whether Bethlehem's bid on the steel portion of the job was not low. Here again the contractor chose to accept the combined bid of plaintiff.

There was no evidence that any defendant ever reduced its price after the bidding, nor any evidence of any concerted action between the defendants regarding bidding. Finally, plaintiff's president testified that "under normal conditions" and "in fair competition" plaintiff would normally expect to get about 10% of the work on which it bid. In 1955 plaintiff bid on 174,041 tons of fabricated work and actually obtained contracts for 19,733 tons—or better than the 10% it expected.

█ Plaintiff's complaint also charges a price-fixing conspiracy. However, plaintiff has never contended that the prices it paid for steel were higher than reasonable or competitive prices nor

is there any evidence from which a reasonable inference of price agreement could be drawn.

■ Steel is a standardized product. The law is clear that even where there is proof of price uniformity in the sale of a standardized commodity, with or without price leadership, that is not sufficient to make a prima facie showing of agreement to fix prices. United States v. Int. Harvester Co., 1927, 274 U.S. 693, 47 S. Ct. 748, 71 L.Ed. 1302.

Furthermore, the testimony of plaintiff's own purchasing agent showed, not uniformity, but differences in the actual prices of steel. Indeed, the actual differences in mill prices, together with freight costs, are of such a substantial nature as to be determinative of the mill from which plaintiff will buy.

As to the remaining charges in the first and second causes of action of the complaint, plaintiff either offered no evidence at all or the charges were so patently unsupported as not to warrant discussion herein. In reviewing separately the evidence relating to each of plaintiff's contentions, the court has not overlooked giving consideration to them in their entirety. The record as a whole has been reviewed and whether plaintiff's charges are taken singly or collectively, the conclusion is inescapable that no logical or reasonable inference of conspiracy between the defendants could be drawn.

It remains to consider briefly the third cause of action against United States Steel Corporation alone. This involves the narrow issue whether that defendant violated section 10 of the Clayton Act in connection with the bidding on certain freight car underframe jobs for the Southern Pacific Company. Considerable evidence was offered and received at the trial solely with respect to this third cause of action.

Section 10 of the Clayton Act requires a common carrier engaged in interstate commerce to hold competitive bidding when purchasing goods or supplies from any concern which has on its board of directors a person who is also a director of the common carrier. It is undisputed that during the period herein involved, Mr. James B. Black was a director of both defendant United States Steel and the Southern Pacific Company.

Preliminarily, United States Steel disputes whether an alleged violation of section 10 of the Clayton Act may be the subject of a private treble damage action. In this case the court need not pass upon that issue, for it is of the opinion that the record in any event fails to show a violation of section 10.

The evidence relates to the acts and conduct of Southern Pacific and United States Steel in connection with a number of bids for car frames between September, 1953, and October, 1955. The uncontradicted testimony of Mr. M. C. Nystrom, general purchasing agent of Southern Pacific, was that Southern Pacific scrupulously followed the provisions of section 10 of the Clayton Act and the applicable regulations of the Interstate Commerce Commission relating to competitive bidding.

■ There is no evidence of any conduct by defendant United States Steel calculated to influence the award of the jobs involved other than the mere submission of its bids in compliance with the applicable statutory requirements. The fact that Southern Pacific accepted United States Steel's bids on certain jobs, although such bids were not in dollar amount the lowest of the bids submitted, will not support any inference of conspiracy between United States Steel and Southern Pacific or of any wrongdoing by United States Steel. Section 10 of the Clayton Act requires the carrier to accept the "most favorable" rather than the lowest bid, and the uncontradicted testimony of Mr. Nystrom was that the bid of United States Steel in each instance where it was accepted was, under all the circumstances, the most favorable to Southern Pacific.

■ In essence, plaintiff's legal contention is that section 10 should be so construed as to require a supplier which has a common director with a carrier to sell steel or other material to any and all persons who wish to compete against

such supplier in bidding to the carrier. There is nothing in the statute, its legislative history or the regulations of the Interstate Commerce Commission to support such an interpretation of the statute.

The motions of the defendants are granted and the clerk is hereby directed to enter verdict and judgment in favor of each of the defendants, United States Steel Corporation, Bethlehem Pacific Coast Steel Corporation, Bethlehem Steel Company, and Kaiser Steel Corporation on both the first and second causes of action herein, and in favor of defendant United States Steel Corporation on the third cause of action herein, together with their costs.