### UNITED STATES v. BORDEN CO. et al.
No. 51 C 947.

United States District Court
N. D. Illinois, E. D.
March 30, 1953.

564

Earl A. Jinkinson, Dallas, Tex., Thomas M. Kerr, Jr., Thomas Rothwell, Chicago, Ill., Bertram M. Long, E. C. Heininger, Ann Arbor, Mich., and Robert L. Eisen, for the United States.

Stuart S. Ball, H. Blair White and Joseph A. Greaves, Chicago, Ill., and Cecil Crouse, New York City (Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel), for Borden Co. and Belmont Dairy Co.

L. Edward Hart, Jr., and Ernest J. London, Chicago, Ill. (Montgomery, Hart, Pritchard & Herriott, Chicago, Ill., of counsel), for Bowman Dairy Co. and Ridgeview Farms Dairy, Inc.

Leo F. Tierney and Charles L. Stewart, Jr., Chicago, Ill. (Mayer, Meyer, Austrian & Platt, Chicago, Ill., of counsel), for Beloit Dairy Co.

CAMPBELL, District Judge.

1. The government charges that each of ten defendant dairy companies has been engaged in a conspiracy to restrain and to monopolize, and has monopolized interstate trade and commerce in the sale of fluid milk to wholesale customers and certain public institutions in the Chicago area, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2. The government also charges that each of ten defendant dairy companies has sold fluid milk in interstate trade and commerce to different wholesale purchasers in the Chicago area at prices which discriminate between said purchasers of fluid milk of like grade and quality, and that the effect of such alleged discrimination may have been and may continue to be substantially to lessen competition or tend to create a monopoly in the sale of fluid milk to wholesale purchasers in the Chicago area, or to injure, destroy or prevent competition between the aforesaid wholesale purchasers knowingly receiving the benefit of such price discriminations and other wholesale customers not receiving the benefit of such discriminations, in violation of Section 2(a) of the Clayton Act, as amended, 15 U.S.C.A. § 13(a).

Paragraph 27 of the complaint defines the alleged conspiracy to monopolize in the following manner:

"The aforesaid combination and conspiracy has consisted of a continuing understanding and concert of action among the defendants, the substantial terms of which have been:

"(a) That each defendant refrain from competing for the fluid milk business of the wholesale customers of another defendant;

"(b) That each defendant offer inducements such as discriminatory prices, rebates, discounts, lump sum cash payments, interest-free loans, or the furnishing of store equipment or other gratuities to wholesale customers of non-defendant distributors of fluid milk to cause said customers to discontinue their purchases of fluid milk from said non-defendant distributors and to purchase fluid milk from the defendant offering such inducement;

"(c) That each defendant induce its store wholesale customers to agree to maintain the retail prices 'suggested' by the defendants;

"(d) That the defendants Bowman and Borden maintain and enhance their dominant market position by acquiring the businesses, including customer outlets, of competing distributors;

"(e) That defendants Bowman and Borden organize and operate 'fighting companies' in order to suppress and destroy the competition of non-defendant distributors;

"(f) That the defendants collusively allocate and share among themselves the business of selling fluid milk to public institutions;

"(g) That the defendants agree upon, fix, and maintain prices for the sale of fluid milk to public institutions by submitting prearranged, bogus, and collusive bids for the sale of fluid milk to such institutions."

Paragraphs 28 through 45 of the complaint contain detailed descriptions of some of the general charges outlined in paragraph 27; these more descriptive paragraphs will be referred to wherever necessary in the course of this memorandum.

In its prayer for relief, the government asks that the alleged conspiracy to monopolize interstate commerce in the sale of fluid milk, as described above, be decreed to be in violation of Sections 1 and 2 of the Sherman Act; that the defendants be decreed to have monopolized interstate commerce in the sale of fluid milk, as described above, in violation of Section 2 of the Sherman Act; that the discrimina-tions in price for fluid milk of like grade and quality, which each of the defendants has allegedly granted to certain of its wholesale customers and not to other of its wholesale customers, be decreed to be in violation of Section 2(a) of the Clayton Act, as amended; that the defendants, individually and collectively, be perpetually enjoined from continuing the alleged discriminations and from carrying out the alleged conspiracy to monopolize and the alleged monopolization of commerce in the sale of fluid milk, as described above; that the defendant Borden Company be required to dispose of its entire interest in defendant Belmont Dairy Company to parties who are not named as defendants; that the defendant Borden Company be required to submit a plan for the divestiture of such of its plants, facilities and other assets, used by its Chicago Milk Division, as is necessary to restore effective competition in the distribution and sale of fluid milk to wholesale customers and public institutions in the Chicago area; that the defendant Bowman Dairy Company be required to dispose of its entire interest in defendant Ridgeview Farms Dairy to parties who are not named as defendants; that defendant Bowman Dairy Company be required to submit a plan for the divestiture of such of its plants, facilities and other assets used by it, as is necessary to restore effective competition in the distribution and sale of fluid milk to wholesale customers and public institutions in the Chicago area; that the agreements, understandings, arrangements and practices of the defendants, alleged in the complaint, be ordered terminated and cancelled. The government has asked for certain other injunctive relief, particularly with reference to certain alleged violations of Section 2(a) of the Clayton Act. I shall describe and comment upon these particular requests for relief in another part of this memorandum.

An extended pre-trial conference was held. At the outset of the conference, counsel apprised the court that five of the ten defendants were conducting negotiations with the government, and that it was likely that agreement would be reached on a consent decree. These negotiations did result in the entry of a consent decree, and

consequently, five defendants—American Processing and Sales Company, Capitol Dairy Company, Hunding Dairy Company, Meadowmoor Dairies, and Western United Dairy Company—did not appear at or participate in the trial. Counsel are now reminded of my comments on this decree, appearing of record at the time of its entry.

Five nonconsenting defendants—the Borden Company and its subsidiary, Belmont Dairy Company, Bowman Dairy Company and its subsidiary, Ridgeview Farms Dairy, Inc., and Beloit Dairy Company— remained as participants in the pre-trial conference, and appeared as defendants at the trial. For the purposes of this memorandum, the court is concerned solely with those five defendants.

A lengthy pre-trial order emerged from the conference. That order contains numerous agreements of fact, agreements on the manner in which certain evidence would be used at the trial, and agreements as to the issues of the case. At this time, I wish to thank all counsel for the able and workmanlike manner in which they participated in the conference and prepared the pre-trial order. I shall refer to specific provisions of the order in the course of this memorandum.

The government has presented its evidence, and the matter is now before the court on the motion of each defendant to dismiss the complaint, or parts thereof.

The first disputed matter which I must resolve entails a construction of Federal Rule 41(b), 28 U.S.C.A., which provides:

"After the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. In an action tried by the court without a jury the court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision * * * operates as an adjudication upon the merits."

Plaintiff contends that this court, in considering the instant motions, is precluded from weighing the evidence. Plaintiff vigorously objects to the defendants' use of the phrase "preponderance of the evidence." According to plaintiff's construction of the Rule, this court must now determine whether or not the evidence considered in a light most favorable to the plaintiff, presents a prima facie case for relief; and, the argument runs, if such a prima facie case is discovered, defendants' motions must be denied. Such a construction of Rule 41(b) has been flatly rejected by the Court of Appeals for this circuit. In Allred v. Sasser, 7 Cir., 1948, 170 F.2d 233, 235, it was made clear that in disposing of a motion to dismiss at the close of plaintiff's case, the court, as trier of fact, must weigh and evaluate the evidence. The meaning of Rule 41(b) is unmistakable after a reading of this language from the Allred opinion:

"* * * the trial court was the trier of the facts, and in considering the evidence was not bound to view it in a light most favorable to the plaintiff, with all attendant favorable presumptions, but was bound to take an unbiased view of all the evidence, direct and circumstantial, and accord it such weight as he believed it entitled to receive."

The Rule was similarly construed by the court in Gary Theatre Co. v. Columbia Pictures Corp., 7 Cir., 1941, 120 F.2d 891, and, more recently, in Chicago & N. W. Ry. Co. v. Froehling Supply Co., 7 Cir., 1950, 179 F.2d 133.

This court is, therefore, under an affirmative duty to review all the evidence thus far presented, and, upon the basis of that review, to determine whether or not the government's evidence warrants the relief sought in the complaint.

I shall first consider all evidence which was introduced to prove violations of the Sherman Act. The evidence may appear disjointed at times; that is because the government necessarily commingled evidence which tends to prove violations of the Sherman Act with evidence which tends to prove Clayton Act violations. I should also note at the outset that I shall consider many items of doubtful relevance and materiality; in another context, such evidence would be excluded summarily. However, as I indicated at the trial, in a case of this nature and scope, the government must be afforded any opportunity, within reason, to support the charges in its complaint. Conspiracies of the sort described in the complaint are difficult to prove, and most often can be proved only through the use of evidence which is circumstantial and seemingly remote. Therefore, in my rulings on the evidence at the trial, and in my review of the evidence at this time, I have admitted and considered any evidence which might in some manner tend to prove the existence of a conspiracy.

Testimony of Witnesses Tending to Prove the Existence of a Conspiracy to Monopolize Wholesale Customers in the Chicago Area.

A. *Solicitors or "contact men" employed by the defendants.*

Seven government witnesses were, at one time or another, employed by the Borden Company or the Bowman Dairy Company to solicit new wholesale accounts. They testified as to certain instructions given to them in the course of their employment, as to some practices current in the industry at the time of their employment, and as to conversations which they had or overheard during their employment. I have outlined this segment of the testimony most carefully, for it is, apparently, the most direct available evidence of the alleged conspiracy. Listing these seven witnesses in the order of their appearance at the trial, that part of their testimony relevant to the proof of a conspiracy is as follows:

(1) *William H. Horton.* In 1941 and 1942, Horton was employed by the Bowman Dairy Company as a solicitor. He received a two-week training period from a Mr. Morley, whom he was replacing. Morley told him how to solicit, and what stops to solicit. Morley explained that "open competition" was "new business, business which was closed and reopened after a period of thirty days, and other dairies that were what they call cut-rate dairies, such as Meadowmoor and smaller ones." Morley further explained that "closed competition" consisted of "Borden, Hunding, Capitol, Western", and "one or two other stops that I forget." Horton was told not to solicit "closed competition."

In the early part of 1942, Horton solicited and won the business of a stop being served by the Capitol Dairy Company. Messrs. Philippi and Moller of the Bowman Company directed the return of this stop to the Capitol Company.

On cross examination, Horton stated that the Bowman officers said that they desired the return of the store to Capitol because the store owner was a relative of a Mr. Shankman, an official of Capitol Dairy Company.

(2) *Otto A. Sedlak.* Sedlak was a solicitor of wholesale accounts for the Bowman Company for three and one-half years, beginning in 1941 or 1942. In 1942, he was told by his superior, a Mr. Block, that he was not supposed to solicit stops like "Borden, Capitol, Western-United." He testified of instances wherein his superiors did not permit him to begin serving stops which were then served by Borden or Capitol, although the proprietors were willing to be served by Bowman. He testified that in the latter part of 1944, he overheard Block speaking on the telephone to a Mr. Katz of the Western-United Company. He overheard Block state to Katz: "You know you took one of our stores, don't you?—Do you know what this means?—We have to go out and get one of yours."

(3) *Herbert W. Horton.* Horton was also a Bowman solicitor during part of the period embraced by the complaint. Mr. Buthman, an official of the Bowman Company, told him that he "wasn't to solicit any stops, such as Wanzer, Hunding, Beloit,

Borden, Western-United, Capitol Dairy, and Hawthorn—all the major large ones that was there." Mr. Kernkamp, another Bowman official, told him that "open competition was any stops, like these smaller dairies, like Dean * * *. After thirty days with Dean, if the Dairy that lost them did not retain them, then that was considered open competition, and I could go in and try to get them for the Bowman Dairy also." Horton made clear that his activities were directed principally, perhaps solely, toward the Dean Milk Company. For example, a list of Dean stops was given to him; but the names of stops served by other dairies, even those characterized as "open competition", were not included.

In March or April of 1946, Horton solicited and "lined up" a Dean stop which had formerly been served by Hunding Dairy. Mr. Kernkamp, his superior, told him that Mr. Hunding of Hunding Dairy requested that Bowman abstain from further solicitation because Hunding still had hopes of recapturing the stop from Dean. Nevertheless, a week or so later, Horton related, he managed to get the business of that stop.

Horton also testified that a Mr. Spitzer, an official of Ridgeview Farms Dairy, told him upon Spitzer's transfer from Bowman to Ridgeview, that "he had worked at Ridgeview before, and that that is the fighting company that Bowman used against the cut-rate dealers."

(4) *Lorne Snoberger.* Snoberger was a Bowman solicitor in 1946. He stated that when he was first employed as a solicitor, Mr. Kernkamp, his superior, told him to solicit stops served by the Dean Milk Company. He was not told to solicit stops served by other dairies. During his employment by Bowman as a solicitor, his activities were confined principally to the solicitation of stops served by the Dean Milk Company.

(5) *Julius Guy Johnston.* Johnston was employed by the Bowman Company as a retail route salesman from 1944 to 1946. He was acquainted with the owner of a wholesale stop along his route, who was then being served by the Beloit Dairy Company. He asked a Mr. Scanlan, his manager, for permission to serve the stop. Scanlan told him that Bowman had an "agreement" with Beloit, "but you go ahead and serve it for awhile and see what happens." Scanlan said that "We might have to give up another stop equivalent to it in order to keep it." Johnston began serving the stop, served for about a week, and was then told by Scanlan to discontinue service. Scanlan again stated that "we would have to quit serving or give up a stop to Beloit equivalent to that." Johnston suggested to the owner that he take milk from another dairy for thirty days; the owner did in fact take milk from the Wanzer company for thirty days, and then resumed Bowman service.

In the latter part of 1945, when one of the witness' stops was solicited by Borden, Mr. Scanlan told the witness: "We have an agreement with Borden, if they take the stop away from us we will get another one in return equivalent to it."

On cross examination, the witness admitted that he was accused of having a "short book" by the Bowman Company after he left that company's employ.

(6) *Raymond Stephens.* Stephens was a solicitor of wholesale accounts for the Borden Company. He was told by a Mr. Creed, his superior, not to comply with requests for service by stops then being served by Bowman, Western-United, Hawthorn-Mellody, and Capitol. According to Stephens, "open competition" consisted of stops served by the Dean Milk Co., Wanzer Dairy Company, and Meadowmoor Dairy Company.

Subsequent to Stephens' employment by Borden, he was a vendor supplied by the Lake Valley Company. After successfully soliciting a stop served by Bowman, he had a conversation with a Mr. Curtin of the Bowman Company, and was told by Curtin to return the stop. He did return the stop, so that Bowman would not "bother" his accounts.

(7) *Sam Parker.* During part of the period embraced by the complaint, Parker was a wholesale foreman employed by the Borden Company. In the fall of 1944, his

superior, a Mr. Creed, did not permit him to serve a wholesale stop which was then served by the Bowman Dairy Company.

Each of these witnesses is a former employe of one of the defendants, and each expressed some degree of animosity toward his former employer. Johnston, in particular, was hostile during cross-examination, and as I noted earlier, the Bowman Company had once accused him of dishonesty. The testimony of each of the witnesses is, therefore, open to some suspicion. Assuming arguendo that all of the foregoing testimony is true, however, just what relationship among the defendants is indicated?

There are but three instances of direct communication between alleged conspirators. First, William Horton testified that he returned a stop to Shankman of the Capitol Company, pursuant to orders given by his superior at the Bowman Company. There is testimony to indicate, however, that the owner of the stop was related to Shankman, and that the return of the stop was motivated by respect for that relationship. Second, Sedlak testified that he overheard his superior at Bowman tell Katz of Western-United that Bowman would "get" a Western stop in exchange for a stop which Western had captured from Bowman. This testimony is as consistent with competitive activity as it is with a conspiracy to monopolize. Third, Herbert Horton testified that Hunding asked Bowman not to solicit a stop formerly served by Hunding. This testimony is rendered meaningless by Horton's later assertion that Bowman thereafter successfully solicited the stop.

The testimony does indicate one rough similarity between the actions of Bowman and Borden, insofar as Stephens, a Borden solicitor, testified that he was instructed by his superior not to comply with requests for service by stops served by Bowman, Western-United, Hawthorn-Mellody, and Capitol. Three Bowman solicitors testified that they were similarly instructed not to solicit stops served by Borden and certain other dairies. However, the court notes that the instructions which these solicitors said they received are at variance with the terms of the conspiracy alleged in the complaint. One Bowman solicitor and one Borden solicitor testified that they might solicit stops served by Meadowmoor; but Meadowmoor is alleged to be one of the conspirators. One Bowman solicitor testified that he could not solicit stops served by Wanzer, although Wanzer is not alleged to be a conspirator. And I note in passing that witness Rhody, a Hunding employe, testified that Hunding, an alleged conspirator, did in fact capture stops served by other of the alleged conspirators.

B. *Wholesale customers served by the defendants.*

The foregoing portion of the record should be considered alongside the correlative testimony of wholesale customers served by the defendants. The government introduced over two dozen witnesses who owned food stores or restaurants in the Chicago area. The testimony of a few of these witnesses corroborates, in a limited way, that of the solicitors employed by the defendants. This corroborative testimony is as follows:

(1) *Richard Myers.* Myers owns and operates a food store in Chicago, and has sold milk supplied by the Capitol Dairy Co. ever since he opened his store in 1946. A representative of the Borden Company told him that unless he was served by Borden from the first day he opened his store, he could not thereafter switch to Borden's. Myers testified that since he began using the services of Capitol, he has not been solicited by dairies other than the Kraml Co. and the Dean Milk Co.

(2) *Louis J. Pushauer.* Pushauer owns and operates a grocery in Chicago. In 1951, the Dean Milk Co. supplied some of his dairy needs and Hunding Dairy supplied others. During the time he split his orders between Hunding and Dean, a Hawthorn representative came to Pushauer's store and inspected his dairy supplies. The next day Hunding Dairy discontinued service. A similar incident occurred while the witness was later being served by Western-United. The witness further testified that the Borden Co. did not respond when he called for service.

(3) *Michael J. Cozzi.* Cozzi owned a grocery store in Chicago and was served by Meadowmoor Dairy. He moved his store, became dissatisfied with Meadowmoor milk, and accepted Bowman's offer to serve. Meadowmoor thereafter solicited Cozzi's business once again. The Meadowmoor solicitor told Cozzi of a "gentlemen's agreement" among the milk companies not to solicit stops within thirty days after service has been discontinued. The witness was not articulate when speaking of this "agreement." Meadowmoor did begin to serve Cozzi again, although it is not clear at whose instance the change was made.

(4) *Julius Soboleski.* This witness owns a grocery in Chicago, and is served by the Borden Co. A Bowman representative told him that Bowman could not serve "as long as I have Borden."

(5) *Philip Bergman.* Bergman owned a grocery in 1947, and was served by the Borden Co. Borden refused a request for financial assistance, and Bergman called Meadowmoor. The Meadowmoor representative said, in the words of the witness, "That he couldn't take the stop over because they had an association with some of the bigger companies not to take stops from each other." The Meadowmoor representative further stated, again in the words of the witness, that "I had to farm out for at least thirty days for a smaller company, and then they would take the stop over." The Meadowmoor representative did not suggest another dairy, but the witness called the Dean Milk Co. After a month of Dean service, Meadowmoor consented to serve.

(6) *Gerald T. Killeen.* Killeen owns a delicatessen in Chicago. At the time he purchased his store, Borden and International Dairy were supplying his milk needs. He desired Ridgeview service, and, after telephoning Ridgeview, a Ridgeview representative came to his store. The Ridgeview representative said, in the words of the witness, that "First he would have to notify those two dairies, and give them a chance to hold the stop." Although the witness called neither Borden nor International, he testified that representatives of both dairies visited him and knew of the contemplated change. The witness switched to Ridgeview anyway, and Ridgeview has been serving him ever since. And, according to the witness, Borden solicited his business even after he changed to Ridgeview. On cross examination, the witness admitted that he may have told the Borden driver about the intended change.

(7) *Louis Miller.* This witness owns a restaurant in Chicago. While he was served by Hawthorn-Mellody, a Hawthorn representative told him that he could not change to another dairy. A Meadowmoor representative told him that Meadowmoor could not serve because of an "agreement." Subsequently, the witness was served by the Wanzer Co. and the Capitol Co. Throughout his testimony, the witness made clear that he asked each dairy for some sort of financial assistance.

I shall now turn to testimony of other wholesale customers served by the defendants. A small part of this testimony is corroborative of that of solicitors employed by the defendants; another and much larger part of this testimony flatly contradicts that of the solicitors, and another part of this testimony is wholly irrelevant to any of the issues in this case.

(8) *Myer Freedman.* Freedman operates a grocery in Chicago, and receives his milk from the Bowman Co. Since Bowman began to serve, only the Dean Milk Co. has bid for his business.

(9) *Dorothea Wallace.* This witness operates a restaurant in Evanston, Illinois. She was served by Bowman, and became dissatisfied with Bowman service. A representative of Hawthorn-Mellody told her he could not serve her. Afterward, however, the Hawthorn representative made arrangements for the witness' employes to pick up milk from a nearby store served by Hawthorn. This arrangement continued for two or three weeks; afterward, Hawthorn delivered the milk directly to her restaurant.

On cross examination Mrs. Wallace admitted that she made no effort to contact another dairy.

(10) *Michael Glaser.* Glaser owned a grocery in Chicago, and was served by the

Borden Co. When he requested service from Meadowmoor, the Meadowmoor representative told him that Meadowmoor could not serve unless the witness first purchased Wanzer milk for four weeks. The Meadowmoor representative also told the witness, and I quote, "They have an association that they can't put milk in a store by taking a stop away from another stop." On cross-examination, the witness stated that it was his impression that there was an association of all the dairies, including the Wanzer Co.

(11) *Andrew D'Alesandro*. This witness formerly owned a restaurant in Chicago. When he first opened his restaurant, he was solicited by representatives of Western-United, Wieland, Borden, and Beloit. He was solicited to the point of annoyance.

(12) *Abraham Wittenberg*. Wittenberg operates a sandwich shop in Chicago, and was originally supplied his milk needs by Western-United Dairy. In 1947, he closed his shop for a few months. While his shop was closed, representatives of Borden, Western-United, Capitol and Meadowmoor bid for his business. He accepted Meadowmoor's offer, and has been served by Meadowmoor ever since.

(13) *Karol Walczak*. Walczak operates a grocery in Chicago. During his ownership of the grocery, many dairies bid for his business. Among the bidders were Dean, Capitol, Borden, Western-United, and Ogden-Schmitts. Even after he accepted Capitol's offer and began selling Capitol milk, the dairies continued to bid for his business.

(14) *Chester Ratajczyk*. This witness owns a grocery in Chicago. While he was served by Hawthorn-Mellody, he gave a Hawthorn representative an "ultimatum." Unless Hawthorn gave the witness an ice box within thirty days, the witness would discontinue Hawthorn service. The Hawthorn representative thereupon told the witness of a "working agreement" between dairies, which prevented storekeepers from moving from one dairy to another. The witness interpreted this statement as a "challenge," and began taking milk from the Dean Milk Co.

(15) *Samuel Pritzman*. This witness owns a grocery and meat market in Chicago. While he was served by Western-United, he noted that the Robinson Dairy served a restaurant across the street from his store. He asked the Robinson driver to serve; the driver refused. The witness moved his store in 1949, and discontinued Western-United service. He was then served by Dean and Wanzer for three months, and thereafter by Meadowmoor.

(16) *Martin Biliack*. Biliack owns a grocery in Chicago. While he was served by International Dairy, a representative of Hawthorn-Mellody told him that Hawthorn could not begin service. The Hawthorn representative further stated, in the words of the witness, that "if I took another dairy that was out of the organization, that I would be able to talk business with him * * *."

The witness also testified that he is now served by Hawthorn, and that the Meadowmoor company bid for his business just two weeks ago.

If any useful purpose could be served by further summarizing testimony of this type, I would do so; but the remaining witnesses add little, if anything, to what has already been repeated. I shall therefore confine my comments to the testimony of the sixteen witnesses recounted above.

Even a cursory reading of this segment of the testimony, much of it pure hearsay at best, reveals glaring inconsistencies. According to some dairy representatives who called upon the storekeepers, certain non-defendant dairies are parties to the objectionable "agreement" or are members of the "association." See, for example, the testimony of witness Biliack. Some of the dairy representatives told some of the storekeepers that they were unable to solicit the business of defendant dairies; it is apparent from the testimony of other storekeepers, however, that the representatives of some defendant dairies did solicit the business of stores served by other defendant dairies. See, for example, the testimony of witnesses D'Alesandro, Wittenberg and Walczak.

This testimony, viewed cumulatively, fails to reveal any consistent pattern of business conduct among the defendants. It does reveal, however, a continuous shuffling

of customers between defendants and non-defendants, and between defendants themselves. Such a shuffling is certainly not consonant with the existence of a monopolized market.

### C. *The witness Eggleston.*

I shall now turn to the testimony of witness Eggleston. Eggleston is a former officer of and a present stockholder in the Bowman Dairy Company. The government conducted a lengthy examination of Eggleston as an adverse witness, and, as a result of that examination, discovered only two instances of direct communication between the defendants. The first communication concerns the formation of defendant Ridgeview by Bowman Dairy Company.

The record shows that Eggleston took an active part in negotiations between Bowman and a union of dairy employees. The record also shows that representatives of various dairies often met to discuss labor problems, and that Eggleston represented Bowman at the meetings. At one such meeting, held some time in 1939, Eggleston discussed the formation of Ridgeview with Mr. Baril, and either Mr. Smaha or Mr. Koenig, all of the Borden Company. During this discussion, the Borden representatives told Eggleston that they too were considering the formation of a subsidiary. Eggleston stated, at page 477 of the transcript:

> "I believe I told them that they were going to use Ridgeview strictly as a distributor company and operate it exclusively with vendors in order to meet such competition as Meadowmoor and Lake Valley, and they mentioned at that time that they were considering very seriously of doing something along the same line."

Eggleston further stated, at page 481 of the transcript:

> "* * * the understanding we had was that we would not use Ridgeview to go out and start a price war against the Borden Company, and they said if they went through with the proposition on Belmont that they would use it strictly to fight vendor competition and to meet the vendor competition."

This is the aggregate of the government's evidence concerning this meeting between representatives of the two companies. The day after Eggleston's testimony about the meeting, the government cross-examined him at length again, but his version of the meeting remained substantially the same, and no new evidence was adduced. See the transcript at pages 523, et seq.

The court first notes that this is an isolated meeting between two of ten alleged conspirators, and that it took place over twelve years ago. The court next notes that the discussion between Eggleston and the Borden representatives took place at a labor negotiation meeting, where, apparently, a variety of topics were "discussed." And finally, the court notes that Eggleston testified, at page 483 of the transcript, that Bowman did lose stops to the Belmont Company, despite the reported assurance from Borden that this would not happen.

The next and final instance of direct communication between alleged conspirators, reported by Eggleston, concerns a meeting attended by Eggleston and Messrs. Peters and Lipsky of Hawthorn-Mellody at the Lake Shore Club in Chicago. The three men discussed a "price war" between Hawthorn and Ridgeview; the discussion lasted 30 or 40 minutes. This, in the words of Eggleston, is the substance of that discussion:

> "We both admitted that we were very foolish for getting into a price war, that neither one of us was making any headway; the only one that was benefiting by it was the storekeeper * * *. Mr. Lipsky said that they didn't want to sell milk below their cost. And I told them we didn't want to sell milk below our cost. * * * If we can get any account at our price, we are going to take it, but it is not our policy to start a price war." (Tr., 545 et seq.)

And this is the aggregate of the government's evidence concerning this second meeting. Here again, the government offers evidence of an isolated meeting between two of ten alleged conspirators; a meeting which took place many years ago.

#### D. *The Witness Heinz.*

The final segment of testimony offered by the government to establish the alleged conspiracy is that of the witness Heinz, who spoke of events in 1940 and 1941, while he was manager of the Evanston Branch of the Bowman Dairy Company. Counsel agreed that Heinz's deposition, taken just before the trial, might be used as evidence at the trial.

Heinz testified that he had frequent meetings with Kastner, who was manager of the Evanston Branch of the Borden Company. According to Heinz, these meetings took place in Evanston restaurants about once every two weeks. At the meetings, Heinz goes on, he would "trade stops" with Kastner. That is, each would determine the amount of business he had taken from the other during a given period, and arrange to return a like amount during a subsequent period. Heinz further testified that at the beginning of each school year at Northwestern University, he and Kastner would agree on the price of milk each would serve to fraternities and sororities at that school.

Unfortunately, the court was unable to view Heinz on the witness stand; I would then be in a position to judge his credibility. The court did view Eggleston on the stand. In certain respects, Eggleston's testimony negates the material contained in Heinz's deposition. Since I believe Eggleston was, over all, a truthful witness, and since there is nothing in the record to corroborate Heinz's testimony, I must discount that testimony. It should be noted also that here, again, the government offers evidence of alleged meetings which took place over twelve years ago between two of ten alleged conspirators.

#### E. *The witness Newey.*

I shall conclude my review of the oral testimony with a comment upon the government's final witness, Newey. Newey is an attorney. He was employed by McConnell, another attorney, who represented the Dean Milk Co. in a private antitrust suit brought against certain Chicago dairies, including two of the defendant dairies. The Dean Case is still pending before another judge of this court.

At McConnell's direction, Newey set out to gather evidence in support of the Dean complaint. Newey set up tape recording devices in a store served by the Dean Milk Co., and, posing as owner of the store, invited solicitation by certain of the defendants. Newey recorded his conversations with each of the solicitors who called at the store. At an early stage of the trial, the government attempted to subpoena the recordings from McConnell; this court held, and McConnell urged that it hold, that the recordings constituted a lawyer's work product, and that this court could not therefore order their production for use at the trial.

Instead of using the recordings at this trial, the government summoned Newey, and asked him to state the substance of each conversation he had with solicitors employed by the defendants. Newey had little, if any, independent recollection of any of the conversations. After each question was asked, he read extensively from transcripts of the recordings and from personal notes based upon those transcripts. His answers were almost all based upon such an extensive reading. In one instance the court noted that Newey read for twenty-two minutes before answering a single question—and this was during direct examination.

█ I held at the trial, on the basis of United States v. Riccardi, 3 Cir., 1949, 174 F.2d 883, 885 and the cases cited therein, that Newey's testimony had little independent probative value, but that the testimony might be admitted for what it is worth. I now hold that the testimony is valueless. It consists, for the most part, of a series of conclusions by Newey, admittedly extracted from the transcripts of the recordings to suit the government's convenience. I shall therefore completely disregard the testimony of witness Newey.

This concludes my review of the oral testimony. I shall now summarize some of the documentary evidence offered by the government to establish the alleged conspiracy.

#### A. *Sales Committee Minutes.*

█ A major portion of the documentary evidence consists of a series of minutes

of meetings of the Sales Committee of the Bowman Dairy Company. Before considering the relevant matter contained in the minutes, I shall comment briefly on the limits of their probative value. First, the subject meetings occurred over a relatively short period of time and more important, during a relatively early period. The earliest meeting which is evidenced by the minutes took place in March 1941; the latest in February 1943. Second, little of what is contained in the minutes represents positive policy or affirmative acts on the part of the Bowman Company; rather, most of the matter contained in the minutes represents informal, sometimes rambling discussion by Bowman officers concerned with a variety of phases of Bowman business. Third, some of the information contained in the minutes is an obvious parroting of gossip gleaned by Bowman employes and others. See, for example, Exhibit 43, which contains a "report from a laundry driver." And the witness Eggleston, who was present at the meetings, testified time and again that much of the matter contained in the minutes was based upon gossip and rumor.

The minutes do have some probative value, however, in that they present an overall picture of the matters which concerned the persons who directed the sales policies of the Bowman Dairy Company during the years 1941 to 1943. During the trial, the government extracted bits of material from each of the minutes, and the government now contends that this extracted material, viewed cumulatively, constitutes evidence tending to prove the alleged conspiracy. The very nature of the Sales Committee minutes makes this effort unrealistic. Nevertheless, I shall review some portions of the minutes which are seemingly consistent with the conspiracy alleged in the complaint. These portions are as follows:

Exhibit 41, dated June 17, 1942:

"(2) Mr. Buthman discussed the Veterans Hospital at Great Lakes and the Great Lakes bid, also Navy Pier and the Hines Hospital."

"(3) Mr. Peck said that he and Mr. Eggleston would plan a meeting with the North Side people early next week."

Exhibit 42, dated August 11, 1942:

"(11) Mr. Buthman discussed with the Committee the milk business at the Great Lakes Naval Training School, Glenview Airport, and Navy Pier. Plans were made for securing our share of this business in the future."

Exhibit 43, dated April 8, 1942:

"(9) Mr. Peck told the Committee that Cream Crest Dairy are a consistent trouble-maker on the North Shore with their plugged bottle. He spoke of rumors that they are for sale."

"(19) Mr. Larson asked Mr. Peck to consider the possibility of Ridgeview's submitting a bid for Ft. Sheridan next month. Mr. Peck said he would discuss this with Mr. Rehorst."

Exhibit 44, dated December 16, 1941:

"(1) Mr. Eggleston told the Committee of a report from Mr. Kettell that Hawthorn-Mellody have instructed their vendors to take business from anybody with no restrictions of any kind."

Exhibit 46, dated October 2, 1941:

"(17) Mr. Larson told the Committee of a conversation with Mr. Ekberg, and passed on a suggestion that Ridgeview's retail routes should be discontinued and the business transferred to Bowman. The loss of $1,100 per month on these routes is not justified, because they do not help us control the price situation as do the store routes."

Exhibit 48, dated October 13, 1942:

"(9) Mr. Peck said that Hawthorn's prices in Highland Park's territory were down to 10¢ a quart to stores. Ridgeview is continuing the fight with Hawthorn."

"(10) Mr. Larson spoke of desperate efforts by Dean to secure independent store business in neighborhoods where National Tea is closing small stores."

Exhibit 49, dated October 20, 1942:

"(4) The Committee discussed the present fight with Hawthorn-Mellody and the score was reported as being approximately two to one in our favor." •

Exhibit 50, dated September 16, 1941:

"(15) * * * There is some price cutting in the factory business, and the Committee agreed to consider a temporary Ridgeview factory route to meet this situation."

Exhibit 59, dated April 29, 1941:

"(12) Mr. Peck told of low Borden prices in the Evanston area, and after some discussion it was decided to ask Mr. Boril and Mr. Koenig of the Borden Company to have lunch with Mr. Eggleston and Mr. Peck next week."

Exhibit 60, dated August 4, 1942:

"(6) Mr. Peck asked the Committee to be certain that all divisions comply fully with the recent memorandum regarding bids on Government business. All such bids are to be sent directly by the Government agency to Mr. Peck at Head Office, and each division is to send a list of such bids and when they are usually received so that any discrepancy can be immediately followed up."

"(16) Mr. Buthman discussed Glenview and Great Lakes and relations with a certain competitor."

Exhibit 71, dated May 19, 1942:

"(11) Mr. Peck told the Committee that Cuneo has not been observing the truce on the North Shore. He said that he had instructed Heinz and Rehorst to call Mr. Peters."

"(22) Mr. Larson reported that Wanzer denied paying 10% on deadbeat collections. Evidently this was merely an excuse by Borden."

Exhibit 83, dated April 28, 1942:

"(14) Mr. Peck told the Committee that Borden's excuse, when asked about paying 10% on delinquent collections, was that Wanzer has been doing it for some time."

Exhibit 739, dated July 30, 1942:

"(12) Mr. Buthman reported trouble with Shankman regarding the Hillman store on State Street * * * Goldblatt's across the street are complaining. Mr. Peck asked Mr. Buthman to call Shankman again and try to straighten the situation out."

The paragraphs I have just quoted are a fair representation of those parts of the minutes which the government claims tend to establish the existence of a conspiracy. During oral argument, counsel for defendant aptly illustrated that many of the paragraphs, when viewed with other evidence adduced at the trial, are as consistent with innocence as with guilt. The court agrees. But the court does not intend to view and to construe each bit of the minutes separately, for each bit becomes meaningless when removed from its text. Each of the minutes must be viewed as a whole, and, so viewed, each is more consistent with a competitive market than with a monopolized market. If the extraction of single paragraphs is at all meaningful, then a series of paragraphs may be contructed which tend to prove that the Bowman Company was concerned with competing, and not conspiring to monopolize. Consider, for example, the following extracts from the minutes:

Exhibit 41, dated June 17, 1942:

"(9) Mr. Larson reported that approximately one-half of Meadowmoor stores in Englewood division are selling at 11½¢.

"(10) Mr. Larson said that factory stores served by Borden, who have the concession system at the New Republic Steel plant, have been unable to displace the two routes we have on the premises because of the support of the Republic Steel employees."

Exhibit 43, dated April 8, 1942:

"(3) Mr. Eggleston told the Committee that Borden's have been furnishing neon signs for some of their stores.

"(6) Mr. Peck told the Committee about a report that Borden's are paying their drivers 10% on all delinquent collections."

Exhibit 49, dated October 20, 1942:

"(12) Mr. Larson mentioned that the 79th Street area has been kicking up again with Capitol Dairy breaking down prices."

Exhibit 51, dated February 17, 1942:

"(3) Mr. Eggleston reviewed with the Committee the competitive situation, with particular reference to Bowman stores that have been split by our competitors using half-gallon bottles. It was agreed to get a list of all such stops and to turn them over to Ridgeview in an effort to serve them with Ridgeview half gallons rather than with the half gallons of the competitors."

"(18) The Committee approved Mr. Larson's request that a space be provided on the new customer memo to indicate the dealer from whom the business was taken. Such a space was formerly provided, but in the reprinting it had been eliminated."

Exhibit 52, dated July 15, 1941:

"(3) Mr. Eggleston asked about the raise in pint prices, and reports were favorable from our entire territory with the exception of North Chicago, where competition for factory business makes it impossible to put the raises in effect at this time."

Exhibit 55, dated November 18, 1941:

"(9) Mr. Peck told the Committee about information received by Mr. Heinz that the Borden Co. is transferring all routes south of Howard and west of Cicero from Evanston to Chicago divisions. * * * According to reports we have received, there is a great deal of dissatisfaction among Borden employees at this time."

Exhibit 70, dated February 4, 1942:

"(1) Mr. Eggleston suggested that all divisions be asked to compile a list of stores that quit them, and new stops that they acquire at the end of each month, showing the number of points involved in each case, and the competition to whom or from whom the stop was transferred. The Committee agreed.

"(4) Mr. Peck said that Hawthorn-Mellody had been bothering the Moraine Hotel in Highland Park with low prices, but stated that we would hold the business."

Exhibit 71, dated May 19, 1942:

"(28) One of Meadowmoor's recent offers to a Bowman store included the following: 10½¢ price, neon signs, cash, free hand bills, a free post card mailing, and a bargain cream deal."

Exhibit 79, dated March 11, 1942:

"(17) Mr. Eggleston told of a rumor from New York that Borden has a contract to serve all the A&P stores in Cook County. The Committee agreed to have divisions get names and addresses of all Borden independent stores, and to star the names of good prospects, but to do no soliciting now."

These paragraphs from the minutes tell about a group of men who are very much concerned with competition. These paragraphs reveal the distrust of a competitor, rather than the trust of a conspirator. These paragraphs, standing alone, are as consistent with competition as the other paragraphs, standing alone, are consistent with a conspiracy to monopolize. But as I stated earlier, it is unreal to view any of the paragraphs alone; the minutes must be viewed as a whole. And, after a careful appraisal of the hundreds of pages which form the minutes, I am of the opinion that they do not tend to show that Bowman conspired to monopolize sales of fluid milk to wholesale purchasers.

B. *Other documents.*

 The government introduced a variety of other documentary material, which, it contends, tends to establish the existence of the alleged conspiracy. This documentary material is marked by the absence of inter-company correspondence. It is marked by the absence of any reference to any inter-company agreement. It is marked by the absence of any reference to any inter-company understanding of any sort. Indeed, the court is more impressed with what the documents fail to show rather than that which the documents show.

The court has carefully reviewed and considered each of the documents offered by the government. Many of the documents are wholly irrelevant to any of the issues of this case. See, for example, Exhibit 37, which is a letter from one Bowman official to another, typewritten on the stationery of the Bowman Dairy Company. The author of the letter first refers to "employees who are not buying our products directly." He then goes on to state:

"Vernon Buchl, 1718 W. 61st Street, is a single man and lives with his parents in the rear of a small store at this location. This is a Borden stop, as we understand, and they have been trying to change for some time but apparently without success. We believe you know more about this situation than we do, so that account would be entirely in your hands."

The government introduces this as independent proof of an alleged conspiracy.

Other documents, seemingly consistent with an allocation of customers among the defendants, were explained credibly and rationally by government witnesses at the trial. The explanations demonstrated, at least to the court, that the documents did not tend to prove the existence of a conspiracy. See, for example, Exhibit 16, which is a letter on the stationery of the Bowman Company and signed by a Bowman official. The letter contains the following language:

"The following is a list of parochial schools in your territory which did not operate under the penny milk program last year. The penny milk program is available to all parochial schools this year and they may give the business to any dairy they wish. Schools served on the penny milk program last year must retain the same dairy they had."

Metzger, who signed the letter, testified (Tr. 324) that the head of the School Board had requested the dairies not to solicit those schools which had operated under the "penny milk" program the previous year, and that Exhibit 16 was written to comply with that request. The explanation is simple, and it is consistent with the language of the letter. Similar explanations were offered for other documents; the court need not repeat all of them at this time. It is true that some of the material in the documents may have more than one meaning; and, if the court assumes the existence of a conspiracy, the meaning offered by the government is certainly proper. But I cannot make such an assumption. I must first search the documents to determine whether they tend to show an agreement among the defendants, or at least permit a reasonable inference of such agreement. I find neither agreement nor implication of agreement.

Evidence Tending to Prove the Existence of a Conspiracy to Allocate the Fluid Milk Business of Certain Public Institutions.

It is charged in paragraph 44 of the complaint that "the defendants have allocated or attempted to allocate among themselves the sales of fluid milk to public institutions in the Chicago area and its vicinity by means of a scheme involving the use of prearranged, bogus and collusive bids." It is charged that such bids were made to one municipal institution (Chicago Municipal Tuberculosis Sanitarium), four Cook County institutions, (County Jail; Juvenile Detention Home; County Hospital; and Oak Forest Infirmary), and five Federal military installations (Vaughan General Hospital, Hines, Illinois; United States Naval Training Station, Great Lakes, Illinois; United States Naval Training School, Chicago, Illinois; United States Marine Hospital, Chicago, Illinois; and United States Army, Fort Sheridan, Illinois).

During oral argument, counsel for the government stated that the alleged allocation of the milk requirements of these public institutions among the defendants was part of the over-all conspiracy charged in the complaint; and paragraph 27 of the complaint specifically lists the submission of prearranged bids and the allocation of the business of these institutions as part of the terms of the alleged over-all conspiracy.

The government relies mainly upon documentary evidence to establish this particular section of the alleged conspiracy. There

is some testimony in the record which the government contends does help establish this part of its case, however, and before commenting upon the documentary evidence, I shall summarize that testimony.

*Albert Bello* testified that during the years 1941 through 1945 he owned the Bello Dairy in Chicago Heights, Illinois. He successfully bid for the milk requirements of the Oak Forest Infirmary in the second quarter of 1942. While the county was still indebted to him for milk supplied during that quarter, Messrs. Shankman and Fried of Capitol Dairy Company told him that the county would pay its debt only if he stopped bidding for the Infirmary business. Bello did not yield to Capitol during this conversation, but he did later. Bello's testimony indicates that he subsequently refrained from bidding for the Infirmary business. Bello further testified that representatives of the various dairies stood near each other just prior to the bidding at the County Building.

*Hans Moser's* testimony concerned the Beloit Dairy Company. Moser, who is vice-president of the Lake Valley Farm Products, stated that after he had successfully bid for the business of the Municipal Tuberculosis Sanitarium, Mr. McGuire of Beloit Dairy called him, and said that Beloit and Hawthorn-Mellody handled the Sanitarium business. McGuire threatened to actively solicit Moser's accounts if Moser continued to bid, and, according to Moser, McGuire did thereafter actively solicit his accounts. *John K. McVeigh's* testimony contains much the same material with reference to Beloit Dairy Company.

*Patrick Cunningham,* who is president of Cunningham Farms, testified that after he had successfully bid for the milk requirements of the County Hospital, Mr. Kettell of the Bowman Company censured him for encroaching on a Bowman account. He also testified as to collusive bidding with reference to the school milk program. Cunningham's testimony further indicates that after he successfully bid for the requirements of the Municipal Tuberculosis Sanitarium, Mr. McGuire of Beloit Dairy Company threatened to capture Cunningham accounts. Beloit thereafter took the Home for Incurables, a large account, away from Cunningham.

■ This testimony establishes the occurrence of four similar incidents. Each incident involves the action taken by one defendant dairy when another dairy attempted to capture an account. Beloit, for example, looked upon the Sanitarium as "its account;" and Beloit became aggressive when another dairy bid for Beloit business. The court holds however, as it must, that these four isolated instances cannot establish the existence of a conspiracy among ten defendant dairies.

I turn now to the documentary evidence relating to this part of the alleged conspiracy. Exhibits one through eleven (Schedules VIII through XVIII of the Pre-trial Order) are tabulations of bids made by dairies for the milk requirements of the aforementioned public institutions. Each exhibit sets out all bids made at a given institution for a period of about ten years, and denotes awards made by the institution for each bid period. The basic documents from which these tabulations were made are not in evidence, but they have been available for inspection by counsel throughout the pre-trial conference and the trial.

The government asks the court to draw certain inferences from the material shown in Exhibits one through eleven. The Exhibits show, for example, that particular defendants have repeatedly submitted low bids to particular institutions. This, says the government, is a basis for inferring that there was repeated collusion among all the defendants. During oral argument, the government spoke about patterns in the bidding, and illustrated, through colored charts, what is shown in Exhibits one through eleven: that certain defendants were alternately successful in bidding for the business of certain institutions. This, says the government, is a basis for inferring that some of the defendants shared the business of certain institutions by agreement. Exhibits one through eleven show that defendants Belmont, Meadowmoor, and Hunding never bid for the milk business of any of the eleven institutions. This, says the government, is a basis for infer-

ring that these defendants agreed to refrain from bidding.

The government also points out that in some instances certain defendants submitted different bids to two different institutions, although the two institutions appeared on one bid form. Defendants answer that this was done by nondefendant dairies too.

The government showed during oral argument that in some instances, a defendant submitted a bid which was higher than that submitted by another defendant which bid successfully the preceding bid period. This, says the government, is a basis for inferring collusion. Defendants answer by demonstrating that in each of Exhibits one through eleven, there are instances of nondefendants who submitted bids which were higher than that submitted by a defendant which bid successfully the preceding bid period.

■ This court is frank to admit that it is unwilling to draw any inferences on the basis of Exhibits one through eleven. Those exhibits demonstrate nothing more than a disposition on the part of certain defendants to bid for the milk requirements of particular public institutions.

The government has introduced other documents which, it contends, tend to prove a conspiracy to allocate the milk requirements of these public institutions. A major portion of these consists of the minutes of the Sales Committee meetings; I commented fully upon these minutes in an earlier part of this memorandum. I have reviewed all the other documents relevant to this segment of the conspiracy, and I have found that the government cannot ground its case upon them.

■ This completes the court's review of all the evidence relevant to the alleged violations of the Sherman Act. Needless to state, there is no direct evidence of an agreement or understanding among the defendants. There is no evidence of intercorporate communication or of significant meetings between alleged conspirators, although the evidence purports to cover a period of over twelve years. The government must rely, then, upon inferences drawn from the conduct of the defendants. This court is aware that such inferences, when properly drawn, may support a finding that there was, in fact, an agreement. In Interstate Circuit v. United States, 306 U.S. 208, 226–227, 59 S.Ct. 467, 474, 83 L.Ed. 610, the court made clear that an agreement is not a prerequisite to an unlawful conspiracy. The court went on to state:

"It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. * * * Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequences of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act."

However, in order to bring its case within the doctrine set forth in Interstate Circuit, the government must establish parallel conduct on the part of each of the alleged conspirators.

■ There is evidence which tends to prove that some of the alleged conspirators, particularly Bowman and Borden, engaged in similar courses of conduct in one respect, Bowman and Borden refrained from actively soliciting each other's accounts. Instead, the evidence now before the court tends to prove that each channelled its solicitation efforts toward new accounts, and toward accounts served by the Dean Milk Company. From such similar conduct, may this court properly infer that those defendants were participants in some plan?

Reasonable businessmen will act similarly when presented with the same problem. This record shows that Bowman and Borden, and every other major dairy in the Chicago area for that matter, were presented with the same problem—the advent of the Dean Milk Co. This record further shows that Bowman and Borden repeatedly lost accounts to the Dean Milk Co. Bowman and Borden each instructed its solicitors to attempt to recapture accounts lost to Dean. If Bowman and Borden agreed

to do this in concert, they have certainly run afoul of the antitrust laws; but there is no evidence to indicate that Bowman and Borden did act in concert. The government merely demonstrates that Bowman and Borden acted similarly, and asks this court to infer a concert of action. I cannot in good conscience draw such an inference. There is testimony in the record to indicate that Bowman and Borden each acted reasonably under the circumstances; this court cannot and will not presume bad motives.

The government must present independent evidence to prove that the defendants were participants in a plan. Thus far, the government has failed to present such evidence. I must therefore hold that the defendants were not parties to an agreement or understanding as alleged in the complaint.

Counsel for the government correctly stated during oral argument that the government's cause of action under Section 2 of the Sherman Act presupposes a finding that there was an unlawful agreement among the defendants. If the defendants are considered collectively, they certainly do monopolize the market defined in the complaint; but for the reasons stated, the defendants may not be considered collectively. · And, as the evidence shows, no single defendant exercises monopoly power over the market defined in the complaint.

The motion of each defendant to dismiss that part of the complaint which charges violations of Sections 1 and 2 of the Sherman Act must be granted.

 The court shall now consider the alleged violations of Section 2(a) of the Clayton Act, as amended, 15 U.S.C.A. § 13(a). That Section prohibits certain discriminations in price between purchasers of commodities of like grade and quality. This court has held that in a suit brought under Section 2(e) of the Clayton Act, the plaintiff must affirmatively establish the occurrence of two sales; and that unless two sales are shown, the plaintiff cannot prove the alleged discrimination. Chicago Seating Co. v. S. Karpen & Bros., D.C. 1949, 83 F.Supp. 409. That construction of Section 2(e) was upheld by the Court of

Appeals, 7 Cir., 177 F.2d 863. Further, the Court of Appeals recognized in its opinion that Section 2(a) should be similarly construed. In the instant case, the government has proved the occurrence of only one sale by the Beloit Dairy Company; that was the sale of certain dairy products to the Eitel Restaurant in Chicago in 1947. (Exhibit 738). With respect to Beloit Dairy Company, therefore, the government has not shown a right to relief under Section 2(a) of the Clayton Act. Beloit's motion to dismiss the complaint must therefore be granted in its entirety.

 I turn next to the charges made against Bowman and Borden under Section 2(a). It is the opinion of the court that the government has shown that Bowman and Borden each has, in past years, discriminated among its purchasers. The evidence relevant to such discriminations is conflicting, and there is much material in the record which tends to show that Bowman and Borden each has some available affirmative defenses. However, at this stage of the case, the court cannot pass on the merits of those defenses. Ordinarily, then, this court would hold that Bowman and Borden each has the burden of establishing that the alleged discriminations come within the scope of certain statutory exceptions.

 There is one factor which compels this court to hold that neither Bowman nor Borden need assume that burden. That factor is the decree which was entered by another judge of this court in the case of Dean Milk Co. v. American Processing & Sales Co., 49 C. 1159, on December 3, 1952. Bowman and Borden were both defendants in that case, and both are subject to the terms of that decree. Since Belmont is a subsidiary of Borden, and since Ridgeview is a subsidiary of Bowman, those two defendants are also subject to the terms of the Dean decree.

In the instant case, the government has asked, in paragraph 10 of its prayer for relief:

"That defendants, jointly and severally, be perpetually enjoined from, in any manner, offering or giving to any

existing or prospective wholesale customer any preferential or discriminatory price, discount, rebate, lump sum cash payment, installment cash sum, interest free loan or other gratuity."

In Section VII of the Dean decree, Bowman and Borden, and their respective subsidiaries are perpetually enjoined from:

"(a) except as permitted pursuant to the provisions of Paragraphs VII(e) or XI hereof, obtaining or attempting to obtain or to retain all or any part of the fluid milk business of any store customer by means of:

"(1) any gift, payment or loan of any property of value made subsequent to December 1, 1952, exclusive of advertising media and including, but not limiting the generality of the foregoing, gifts, payments, loans or any offers of gifts, payments, loans of money, merchandise, fixtures, or equipment;

"(2) except on a proportionately equal basis, services or facilities or offers thereof;

"(3) extensions of credit beyond thirty (30) days;

"(4) arranging or facilitating or offering to arrange or to facilitate through accommodation endorsements, guaranties or other use of credit the obtaining or retaining of loans or credit from others;

(b) charging or offering to charge different store customers or prospective store customers different prices for fluid milk, except as permitted pursuant to the provisions of Paragraphs VII(e) or XI hereof;

"(c) giving or paying or offering to give or to pay rebates, commissions, discounts, or allowances to different store customers or prospective store customers in connection with purchases of fluid milk, except as permitted pursuant to the provisions of Paragraphs VII(e) or XI hereof;

"(d) giving or paying or offering to give or to pay a store customer, in connection with his purchases of fluid milk, rebates, commissions, discounts or allowances computed on the basis of a percentage of the out-of-store prices at which such fluid milk is sold.

"(e) Nothing contained in this decree shall be construed to prevent a party to this decree from classifying its store customers on the basis of the volume of purchases by said customers and from giving to each such class of customers such price discounts as are justified by differences in the cost of selling and delivering to the said respective classes of customers, or as may be otherwise permitted by law; or from entering into or continuing in force and effect any contract giving effect to any such classification, or as may be otherwise permitted by law."

Section XI, referred to at points throughout Section VII merely provides that: "Nothing contained herein shall be construed to prevent a party to this decree from meeting the competitive offers, practices, prices or discounts of competitors insofar as it is lawful so to do, or from collecting any monies or other property lawfully due now or hereafter from any customer."

Thus, the terms of Section VII of the Dean decree clearly enjoin Bowman, Borden, Ridgeview and Belmont from performing all acts which the government has specified in paragraph 10 of its prayer for relief.

A decree of this court entered at the instance of a private litigant is as binding upon a defendant as a decree entered at the instance of the government; and a consent decree, entered by any judge of this court without hearing evidence, is as binding as a decree entered by another judge after a protracted trial. I conclude, therefore, that each of the remaining defendants is now effectively enjoined by this court from performing any of the acts set forth in the government's prayer for injunctive relief, insofar as the Clayton Act is concerned.

As a court of equity, I will not perform a useless task. The violations of the Clayton Act described in the complaint and shown at the trial are, for the most part,

old violations. And to this court, the Dean decree assures, as completely as any decree can assure, that there will be no new violations.

For the foregoing reasons, the motions of defendants Bowman, Borden, Ridgeview, and Belmont to dismiss that part of the complaint which alleges violations of Section 2(a) of the Clayton Act must be granted.

I am convinced that this suit insofar as it charges Sherman Act violations should not have been filed. The government began its investigation of this phase of the milk industry in Chicago in 1947, and has had six years to gather evidence in support of the charges in its complaint; yet this court now holds, as it must, that such evidence has not been gathered. I have deliberately reviewed the record in a manner most favorable to the government, and have found its case to be utterly lacking in substance. The government thought it necessary to subpoena counsel for the Dean Milk Company at an early stage of this trial, and sought the production of material he had prepared for the Dean litigation. This court then had to balance an attorney's right to the privacy of his work product against the right of the government to amass evidence for trial. This was an unpleasant dispute, and a dispute which should not have been presented to this court. It is also apparent that a portion of the government's evidence was scraped together during the trial. Many of the government's witnesses were contacted and interviewed after the trial had begun, and some of them offered no relevant testimony whatever during examination. These factors leave little room for doubt, at least in the mind of the court, as to the quantum of evidence in the hands of the government at the time this complaint was filed.

These observations raise important and troublesome questions. The calendar of this court has been and remains congested beyond belief; and antitrust litigation of this sort doubles the congestion. I recognize that I have an obligation to hear and to determine antitrust suits brought by the government; I stated at another stage of these proceedings that I also recognize that

government antitrust suits should be expedited whenever possible. I recognize even more fully, however, and the Antitrust Division should recognize, that I have other compelling obligations to other litigants. Indigent persons accused of crimes, plaintiffs who complain of serious personal injuries, inmates of penal institutions who seek hearings on petitions of habeas corpus—all these and others also have a right to be heard, and to be heard quickly. Yet they must stand aside during long antitrust litigation. It is therefore imperative that some responsible agent of the government appraise these protracted cases before they are brought into court. A lawyer's appraisal of the evidence in this case would have revealed the weakness I speak about today. Certainly, the Antitrust Division suspects wrongdoing in the milk industry; but a case cannot be built upon suspicions. As a court, I must ask for evidence; and the Antitrust Division should have substantial evidence, based upon its own investigations, before it comes to court. A careful appraisal of the government's evidence should have been made by some person in the Antitrust Division long ago; and the obvious absence of such an appraisal casts serious and unpleasant reflections on the motives of the Antitrust Division in bringing this suit. Counsel for the defendants remarked some time ago that this litigation was nothing more than a fishing expedition, an expedition to glean evidence for the prosecution of a companion criminal case pending before another judge of this court. I feel compelled to comment that the remark has to some extent been justified by my review of this month's record.

These remarks are certainly not directed toward government counsel who are assigned to the trial of this case. Each of government counsel, under the fine direction of Mr. Jinkinson, has rendered an excellent performance. Government counsel were simply not supplied with the evidence necessary for success in this court; but they performed splendidly with the little evidence they had.

For the reasons stated in this memorandum the motion of each defendant to dis-

miss the complaint is granted in its entirety, and, accordingly, the complaint is dismissed.

In accordance with the provisions of Rule 52(a), counsel for the defendants may prepare and file with the court, in writing, within fifteen days from the date hereof, proposed findings of fact, conclusions of law, and a draft of a proposed order of dismissal, consistent with the views herein expressed, delivering copies thereof to counsel for the plaintiff. Within fifteen days of the receipt of such copies, counsel for the plaintiff may prepare and file with the court, in writing, their observations with reference thereto and suggestions for the modification thereof, delivering a copy of such observations and suggestions to counsel for the defendants. Within ten days thereafter, counsel for the defendants may present to the court, in writing, their reply to such observations and suggestions. Whereupon, the matter of making findings of fact, conclusions of law and order of dismissal herein will be taken by the court without further argument.