Burt PARSONS and Freeman Parsons,
d/b/a Eastman Theatre, Plaintiffs,

v.

PARAMOUNT FILM DISTRIBUTING
CORPORATION, a corporation,
et al., Defendants.

No. 4–59 Civil 82.

United States District Court
D. Minnesota,
Fourth Division.

Feb. 12, 1963.

Keith D. Kennedy, Minneapolis, Minn., for plaintiffs.

Philip Neville and Bruce F. Thompson, Neville, Johnson & Thompson, Minneapolis, Minn., for distributor defendants.

Mandt Torrison, of Bundlie, Kelley & Torrison, St. Paul, Minn., for Minnesota Amusement Co.

NORDBYE, District Judge.

Buena Vista Film Distribution Co., Inc., and Allied Artists Pictures, Incorporated, were dismissed as defendants by the plaintiffs at the close of all the testimony.

The basic factual situation underlying this action is as follows. Prior to 1950, the defendant Minnesota Amusement Company, hereinafter referred to as MAC, a corporation which owns and operates theaters in Minnesota, North and South Dakota and Western Wisconsin, owned and operated three theaters, the Paramount, the Hayes, and the Eastman, in St. Cloud, Minnesota. At this time, the evidence shows that the Paramount was being operated as an "A" house [1]

---

1. The term "A" house as used in the motion picture industry refers to a theater which generally exhibits, as single features, superior quality motion pictures on a first-run basis at generally higher admission prices.

and that the Hayes and the Eastman were being operated as "B" houses.[2] Then in late 1949 or early 1950, MAC sold the Eastman Theater to a third party, who in turn sold it to the plaintiffs in the spring of 1950. The plaintiffs continued to operate the Eastman as a "B" house until February of 1951. At this time they sent letters to the distributor defendants requesting the right to bid against the MAC theaters for the distributor defendants' superior quality first-run motion pictures. A short time thereafter, the plaintiffs received letters from all of the distributor defendants which stated that the plaintiffs would be accorded the opportunity to bid competitively on that type of motion picture. The plaintiffs then commenced bidding and continued to do so until late August of 1956. At this time the plaintiffs sent letters to the distributor defendants in which they stated that they wished to discontinue competitive bidding. From that time until March of 1957, the plaintiffs negotiated on a picture by picture basis with the individual distributor defendants for the right to license motion pictures. Then in March, 1957, the plaintiffs once more sent letters to the distributor defendants in which they requested that they be accorded the opportunity to bid competitively once more. This request was also promptly granted. The plaintiffs bid competitively for a few months. They then requested that the competitive bidding cease. From that time until the time the summons and complaint was filed on the 26th of May, 1959, the plaintiffs have negotiated with the distributor defendants for licensing rights to show their motion pictures.

The plaintiffs have charged in their complaint that for the past six years[3] prior to the institution of this suit, the distributor defendants and MAC have conspired between and among themselves with the purpose of restraining trade in the St. Cloud area by depriving the plaintiffs of superior motion pictures. They further charge that said conspiracy was in violation of the Sherman Act and has resulted in damage to the plaintiffs.

The Paramount Theater has a seating capacity of 1,409 as compared to Eastman's 450. In addition, the Paramount has daily matinees as compared to Eastman's sole matinee on Sunday. Its location is better than Eastman's. It charges a higher admission price, and was considered by the distributors as being superior to Eastman in appointments, furnishings and attractiveness. Obviously, under the film licensing agreements which provided that film rental should be computed on a percentage of gross admission receipts, Paramount's policy of showing a picture at a daily matinee as well as during the evening would normally increase the rental return to the distributors. The local officials of the distributors who testified were unanimous in their opinion that the difference in the seating capacity of the two theaters was of significant importance, primarily because of the great upsurge in attendance at motion picture theaters during the weekends. Consequently, it seems idle to contend that the greater seating capacity of the Paramount, with its larger attendance, did not constitute an important factor in the consideration admittedly given to the question as to which theater should be awarded for exhibition any certain pictures released by any one of the distributors. And this must be true whether the picture was awarded by bidding or by negotiation. Reference may be made to General Defendants' Exhibit F. This exhibit lists the days between January 1, 1954, and the date when the complaint was filed when the number of Paramount's paid admissions would have exceeded Eastman's even though it is assumed that the latter theater would have been filled to

2. The term "B" house refers to a theater which generally exhibits, as single or more usually double features, inferior quality motion pictures or second and third runs of superior quality motion pictures at lower admission prices.

3. On the 6th day of August, 1959, this Court granted the defendants' motion to amend the complaint to conform with the four-year limitation period provided by Section 4B of the Clayton Act, 69 Stat. 283 (1955), 15 U.S.C. § 15b.

capacity, then completely emptied, and filled again on the same day. In 1954, there were 73 days when Paramount's paid admissions would have exceeded the number of hypothetical customers at the Eastman by 24,137; in 1955 there were 55 days with excess paid admissions of the Paramount totaling 16,867; in 1956, there were 33 days with 10,913 excess paid admissions; in 1957, 27 days with 8,189 excess paid admissions; in 1958, 25 days with excess paid admissions totaling 9,326; and in 1959 up to the time the complaint was filed, 16 days with excess paid admissions totaling 6,059. The grand total would be 229 days with some 75,491 paid admissions in favor of the Paramount.

Throughout this proceeding, the plaintiffs have labored the contention that the superior quality pictures were allocated to the Paramount, and that the Eastman was relegated to those which were given to the ordinary Class "B" houses, and that when Paramount played the better pictures, Eastman was in most instances playing an inferior picture which distorted the drawing capacity of the two theaters in favor of the Paramount. They contend that between June 1, 1955, and May 31, 1959, some 334 superior pictures were exhibited at the Paramount. The validity of this figure submitted by the plaintiffs is subject to serious doubt, but even assuming its correctness, the gross admission receipts received by Paramount from these pictures were in excess of $243 per tenth [4] and the film rental paid was $91 per tenth. The plaintiffs admit that they have exhibited some 39 superior pictures during the eight-year period they had owned and operated the Eastman. As-

suming this figure to be correct, the evidence discloses that the gross admission receipts of the Eastman were approximately $112 per tenth. Comparison of the film rental actually paid by Paramount with the gross receipts obtained by Eastman readily reflect the reasons why these distributors preferred to have their better pictures first shown at the Paramount.

Reference may be made to the persuasive nature of the great number of telegrams and letters sent by the local officials of the distributors to their home offices during this period when recommendations were to be made as to the placing of any particular picture in the Paramount or the Eastman. These letters and telegrams written a number of years in advance of this lawsuit lend convincing substance to defendants' position that in releasing pictures in St. Cloud, each of the distributors was acting upon its own independent judgment and in the furtherance of its own business interests.

The plaintiffs complain of MAC's position because the latter refused to split with Eastman the better quality pictures as between the Paramount and the Eastman. They emphasize that Mr. Branton of MAC candidly admitted that he attempted to obtain for the Paramount, as against the Eastman, the superior quality pictures as they were released by the distributors. But the refusal to split products with Eastman by MAC does not give the plaintiffs any support for their contention that there existed an unlawful conspiracy as between MAC and these defendant distributors, or any one of them. The distributors cannot be required to carry on their business contrary to their best interests, and any ar-

4. The term "tenth" refers to a unit of the tenths system, which is used in the motion picture industry to reflect the fact that motion picture theater attendance is potentially greater on certain days of the week than on others. In order to reflect this, the week is broken down into ten parts or tenths. Sunday, the most popular day for motion picture attendance, receives a value of three tenths; Saturday, the next most popular day, receives a value of two tenths, and the weekdays each receive a value of one tenth. The per tenth figures used in this opinion are arrived at by taking either the gross admission receipts or the gross film rentals paid and dividing them by the number of tenths assigned to the days the motion picture or pictures actually played at the Eastman or Paramount Theaters.

rangement between Paramount and Eastman whereby they would agree to split the superior quality pictures as they were released would be contrary to the best interests of both MAC and the distributors.

The plaintiffs proceed under the mistaken assumption that because Paramount was considered by most of the distributors as the only "A" house in St. Cloud, there was created a wall between Eastman and its opportunity to demonstrate to the distributors that it could gross film rental on superior quality pictures equal or superior to Paramount, and plaintiffs allege that if Eastman had been accorded the opportunity to display the same superior quality pictures made available to Paramount, it would have demonstrated that it was entitled at least to a split product arrangement with Paramount. But plaintiffs were afforded that opportunity and refuse to recognize the stark realities of their attempts to compete with a house which consistently offered a more attractive film yield to the distributors. There is no showing here which would justify a finding that during the bidding period when pictures were awarded to Paramount, Eastman's bids were actually superior. It must be recognized that during bidding as well as negotiation, many matters must be considered by the distributors in weighing the factors which enter into the determination as to which theater should be allotted any certain picture. The record is replete with illustrations which demonstrate the superior earning ability of the Paramount as compared with the Eastman. General Defendants' Exhibit I, which covers the period from June 1, 1955, to May 31, 1959, reflects that Paramount paid 37.3 per cent of its gross admission receipts to the defendant distributors for film rental, while the Eastman during the same period paid some 32.8 per cent. This difference is not so impressive until one stops to consider that the 37.3 per cent paid by the Paramount was paid on admission receipts totaling $520,873, while the 32.8 per cent paid by the Eastman was paid on admission receipts totaling $165,312. In other words, the *total film rentals* paid by the Paramount during this period exceeded the *admission receipts* of the Eastman by almost $30,000. A comparison of the *film rentals* paid by the two theaters shows that Paramount paid over three and one-half times as much film rental as the Eastman during this period.

A further comparison of the film rentals paid by the two theaters is found in General Defendants' Exhibit J, which includes all of the motion pictures awarded on competitive bids. A summarization of this exhibit clearly shows that during the competitive bidding period the Paramount paid to the distributor defendants from almost two to five times more film rental per motion picture than did the Eastman.[5]

Another comparison, which is probably the most demonstrative comparison made at the trial, is found in General Defendants' Exhibit H. This exhibit was prepared in light of the aforementioned fact that the average per tenth gross admission receipts received at the Eastman was $112 on the 39 motion pictures, which the plaintiffs have admitted were superior motion pictures. The film rental which would have been paid on this figure of $112 per tenth is then compared to the

| 5. Distributor | Period Covered by Exhibit | Paramount Film Rental per Picture | Eastman Film Rental per Picture |
|---|---|---|---|
| MGM | 4/51–9/56 | $ 707 | $370 |
| Paramount | 4/51–9/56 | 1,022 | 212 |
| Fox | 7/51–9/56 | 557 | 229 |
| Warner Bros. | 9/51–9/56 | 630 | 285 |
| United | 3/54–9/56 | 654 | 227 |
| Columbia | 4/51–5/57 | 654 | 222 |
| Buena Vista | 7/55–9/56 | 626 | 113 |

film rental actually paid by the Paramount on those motion pictures for which the plaintiffs claim their bid was superior to that of the Paramount and the differences have then been noted. This comparison is as follows:

| Distributor | Film Rental received from Paramount on Pictures Plaintiffs Claim Their Bid was Equal to or Better than Paramount's | Film Rental Distributor would have received from Eastman at $112 per Tenth | Difference |
|---|---|---|---|
| Fox | $27,091 | $19,776 | $ 7,315 |
| Warner Brothers | 26,023 | 15,671 | 10,352 |
| United Artists | 4,380 | 2,477 | 1,903 |
| MGM | 6,472 | 4,399 | 2,073 |
| Paramount | 16,819 | 8,734 | 8,085 |
| Totals | $80,785 | $51,057 | $29,728 |

It can readily be seen from this exhibit that if the five distributor defendants mentioned therein had accepted the offers made by the Eastman, they would have received, based upon the performances of the Eastman in regard to the exhibitions of other superior motion pictures, an amount of film rental which in the aggregate would have been almost $30,000 less than they actually received from the Paramount.

Also it may be noted that during the course of the trial and in their trial memorandum the plaintiffs repeatedly have called to the Court's attention four motion pictures exhibited at the Eastman and which, according to the plaintiffs, clearly demonstrate the revenue-producing ability of the Eastman in respect to the exhibition of superior quality motion pictures.[6] However, a similar listing of the four best revenue-producing motion pictures exhibited at the Paramount illustrates that the Paramount's average per tenth gross admission receipts were approximately three times those of the Eastman.[7] An even more striking comparison arises when one stops to consider

6. These motion pictures and their revenue-producing results are as follows:

| Picture | Number of Tenths | Gross Admission Receipts | Gross Admission Receipts per Tenth |
|---|---|---|---|
| The Long, Long Trailer | 13 | $1,959 | $150.69 |
| Blackboard Jungle | 18 | 2,960 | 164.44 |
| Trial | 19 | 3,762 | 198.00 |
| Forever Darling | 11 | 2,024 | 184.00 |
| Totals | 61 | $10,705 | |

Average per Tenth ($10,705 divided by 61)
$175.49

7. These motion pictures and their revenue-producing results are as follows:

| Picture | Number of Tenths | Gross Admission Receipts | Gross Admission Receipts per Tenth |
|---|---|---|---|
| The Glenn Miller Story | 9 | $5,225.60 | $580.62 |
| Caine Mutiny | 10 | 5,057.13 | 505.71 |
| Battle Cry | 10 | 5,123.89 | 512.39 |
| Bridge on the River Kwai | 10 | 6,322.64 | 632.26 |
| Totals | 39 | $21,729.26 | |

Average per Tenth ($21,729.26 divided by 39)
$447.16

that the evidence discloses that the per tenth gross admissions of all the motion pictures, whether superior or not, exhibited at the Paramount exceeds the per tenth figures of the four best grossing pictures that ever played the Eastman by over $70 per tenth.

A number of branch managers of the distributor defendants compared motion pictures produced by their respective companies which they testified were substantially equal in respect to quality. About half of these motion pictures thus compared had been exhibited at the Paramount while the other half had been exhibited at the Eastman. The results of these comparisons were to the effect that the motion pictures exhibited at the Paramount generally returned to the exhibitor and the distributor an amount from two to five times larger than did the motion pictures of comparable quality exhibited at the Eastman. For example, M. A. Levy, Branch Manager of Fox, made the following comparison between four motion pictures exhibited at the Paramount and four motion pictures exhibited at the Eastman:

| Motion Picture | Days Played | Tenths | Gross Admission Receipts | Film Rental Paid | Percentage | Per Tenth Gross Admission Receipts |
|---|---|---|---|---|---|---|
| | | | PARAMOUNT | | | |
| Halls of Montezuma | 4 | 5 | $2,037.26 | $ 826.13 | 40.5 | $407.45 |
| Take Care of My Little Girl | 3 | 5 | 1,473.03 | 558.23 | 37.0 | 294.60 |
| With a Song in My Heart | 5 | 8 | 2,684.00 | 1,112.27 | 41.4 | 335.50 |
| Jap Warbride | 2 | 2 | 649.07 | 247.54 | 37.5 | 324.54 |
| Totals | | 20 | $6,843.36 | $2,744.17 | | |
| Average per Tenth Gross Admission Receipts: | | | | | | $342.17 |
| | | | EASTMAN | | | |
| Decision Before Dawn | 4 | 5 | $ 722.02 | $ 252.71 | 35.0 | $144.40 |
| Viva Zapata | 5 | 7 | 538.23 | 201.84 | 37.5 | 76.89 |
| Five Fingers | 5 | 6 | 393.51 | 147.57 | 37.5 | 65.59 |
| Pride of St. Louis | 7 | 10 | 1,092.10 | 409.54 | 37.5 | 109.21 |
| Totals | | 28 | $2,745.86 | $1,011.66 | | |
| Average per Tenth Gross Admission Receipts: | | | | | | $ 98.07 |

Of a similar nature were the results of the comparisons made by Myron Adcock, Branch Manager of Warner Brothers; Jesse McBride, Branch Manager of Paramount; Byron Shapiro, Branch Manager of Columbia; and LeRoy Miller, Branch Manager of Universal. Among the pictures compared by Mr. Miller, there were a number of so-called series pictures. By series pictures, the Court has reference to such motion pictures as those featuring Abbott and Costello, Ma and Pa Kettle, and Francis, the Talking Mule, in which the same star or stars perform the same roles in different comedy-type situations. The comparisons of these motion pictures are of significance because of the great similarity between pictures within a series. However, a comparison as to their exhibition value clearly shows that the Paramount exhibitions of these pictures resulted in much

larger gross admission receipts and per tenth receipts than did the Eastman exhibitions. For example, "Abbott and Costello Join the Foreign Legion" grossed $1,362 for an average of $341 per tenth at the Paramount, while "Abbott and Costello Meet the Invisible Man" grossed $810 for an average $101 per tenth at the Eastman; "Ma and Pa Kettle on Vacation" grossed $2,293 for an average of $328 per tenth at the Paramount, while "Ma and Pa Kettle at the Fair" grossed $1,763 for an average of $176 per tenth at the Eastman; and "Francis Goes to the Big Town" averaged $222 per tenth at the Paramount while "Francis Joins the W.A.A.C.'s" averaged $101 per tenth at the Eastman.

■ Finally, it may be noted that plaintiffs' claim against the distributors rests primarily upon a showing of an alleged parallel course of business conduct on their part. There is respectable authority holding that before an inference of a conspiracy may be drawn from mere parallel conduct of distributors, it must be shown that such conduct is contrary to their best interests. Independent Iron Works, Inc. v. United States Steel Corp., N.D.Calif., 1959, 177 F.Supp. 743; Dipson Theaters v. Buffalo Theaters, 2 Cir., 1951, 190 F.2d 951. And see Theatre Enterprises, Inc. v. Paramount Film Dist. Corp., 1954, 346 U.S. 537, 540, 541, 74 S.Ct. 257, 98 L.Ed. 273. Here, the evidence requires a finding that all of the distributors, as well as MAC, were acting in furtherance of their best business interests and not contrary thereto when during this period the distributors accorded the bulk of their superior motion pictures to Paramount instead of Eastman and that the distributors and MAC would have shown a lack of ordinary business prudence and acumen had they acted otherwise.

■ The foregoing may be considered as the Court's Findings of Fact herein, and as Conclusions of Law therefrom, the Court finds that plaintiffs have failed to sustain the burden of proof as to any violation of the Sherman Act on the part of these defendants as alleged in the complaint, and that judgment must be entered in favor of the defendants, and each of them, together with their costs and disbursements herein. Let judgment be entered accordingly. In view of the above disposition, it is not necessary to consider the question of damages.

An exception is reserved.